FILED

08/24/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0696

DA 14-0696

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 214

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DAVID THOMAS WEISBARTH, II,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDC-13-062
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Chief Appellate Defender, Jennifer Hurley, Assistant
            Appellate Defender, Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Pamela P. Collins, Assistant
            Attorney General, Helena, Montana

            John Parker, Cascade County Attorney, Jennifer Quick, Deputy County
            Attorney, Great Falls, Montana

Submitted on Briefs:  May 11, 2016

Decided:  August 24, 2016

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 David Weisbarth appeals his conviction from the Eighth Judicial District Court, Cascade County, for incest against his minor child, T.W. Weisbarth argues that he is entitled to a new trial based on the State's failure to disclose T.W.'s medical records. We agree. The State obtained T.W.'s medical records and then failed to disclose those records to the defense. The medical records contained evidence that was clearly favorable to the defense, and the withheld evidence places the trial in such a different light that it undermines our confidence in the jury's verdict.[1] We reverse and remand for a new trial.

¶2 The issue on appeal is whether Weisbarth is entitled to a new trial based on the State's failure to disclose T.W.'s medical records.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 David Weisbarth is the birth father of T.W. Since age three, T.W. has resided with her maternal grandfather Roy, who is her permanent guardian. Sometime between October 23, 2012, and December 13, 2012, when T.W. was five years old, Roy took T.W. to visit Weisbarth at his apartment in Great Falls. Soon after visiting her father, T.W. reported to law enforcement that Weisbarth had sexually abused her in his bathroom. T.W. alleged that Weisbarth took her into the bathroom and "all of [a] sudden started touching my private parts with his fingers." As relevant to the defense's trial strategy,

---

[1] The parties submitted a joint motion to seal their briefs and supporting documents because of confidentiality concerns regarding T.W.'s medical records. This Court issued an order authorizing the sealing of the briefs and supporting documents. While this Opinion discusses information contained within T.W.'s medical records, we have, to the extent possible, labored to protect the confidentiality of the records while simultaneously observing that any opinion of this Court must be public.

prior to T.W.'s allegation of sexual abuse, she was diagnosed with reactive attachment disorder. In an attempt to treat her disorder, T.W. has seen a number of medical professionals, including two child specialists: Dr. Thomas Krajacich, a neuropsychologist, who started treating T.W. in early 2010; and Dr. Melinda Pike, a child psychiatrist, who began treating T.W. the following year.

¶4 On February 7, 2013, the State charged Weisbarth by Information with one count of felony incest in violation of § 45-5-507, MCA. On April 1, 2014, Weisbarth provided notice to the State that he intended to call Dr. Donna Veraldi, a child psychologist, as an expert witness to testify about reactive attachment disorder and its possible effects on a child's behavior— in particular, its tendency to affect a child's propensity for truthfulness. The State filed a motion to exclude Veraldi's testimony, reasoning that Veraldi did not have a basis to testify about T.W.'s disorder because Veraldi had not reviewed T.W.'s medical records. In response, Weisbarth filed a motion to compel the State to produce T.W.'s medical records so Veraldi could form a basis to testify as to T.W.'s specific ailments. The District Court permitted Veraldi to testify and granted Weisbarth's motion. The court ordered that the State produce the medical records directly to Weisbarth.

¶5 On May 15, 2014, four days prior to the start of trial, the State filed a motion for an in camera inspection of T.W.'s medical records.[2] The prosecutor represented to the court and defense counsel that she had reviewed the records, but expressed concern that

---

[2] The State obtained T.W.'s medical records after obtaining Roy's written consent for their release.

3

T.W.'s "privacy rights have been implicated, such that the State does not feel comfortable" producing the medical records to the defense without the District Court reviewing the records *in camera*. The prosecutor did not alert the court or defense counsel that the records contained exculpatory evidence. Instead, the prosecutor stated that the information about T.W. was "intertwined with a multitude of other information, which the State does not believe to be discoverable."

¶6 The next day, on May 16, 2014, the State filed a motion to seal the medical records. The prosecutor acknowledged that, given the proximity to the start of trial, her request for an *in camera* inspection was not possible. The State then sent a heavily redacted copy of the medical records to Weisbarth. The State explained that it "redacted the medical records, in light of the victim's privacy interest, so that they are limited to the diagnosis of Reactive Attachment Disorder, the date, and the likely cause." As a result, the redacted medical records provided to Weisbarth consisted of a single sentence from a three-page report written by Krajacich. The portion of Krajacich's report provided to the defense stated, in its entirety: "We will go slowly with differential diagnoses; but at this time, I am convinced this young girl has reactive attachment disorder most likely based on early neglect or even possible abuse." The District Court granted the State's motion to seal the medical records, without ever viewing the records in chambers. The State did not inform the defense or the District Court at any subsequent time that exculpatory information existed in the medical records.

¶7 On May 19, 2014, the matter proceeded to trial. The only direct evidence presented by the State against Weisbarth was T.W.'s testimony. T.W. testified that

during a visit to Weisbarth's apartment, he pulled down her pants and his pants; touched her private parts; and asked her to touch his private parts, but she refused. The State presented little circumstantial evidence in support of T.W.'s testimony. Dr. Nancy Maynard, who examined T.W. after the alleged incident, testified that there were no physical signs of abuse. Dr. Robert Page, a child psychologist, who reviewed a videotaped interview of T.W., testified that some aspects of T.W.'s disclosure were reliable, some aspects were unreliable, and T.W.'s disclosure was probably more consistent with an actual event. Roy testified that Krajacich indicated to him that T.W.'s disorder was relatively mild. Roy further testified that T.W. was "doing super" prior to the alleged incident and her counselor had indicated that T.W.'s disorder was not having a substantial impact on her behavior. Veraldi testified for the defense. The defense attempted to use Dr. Veraldi's testimony to attack T.W.'s credibility. Veraldi testified that frequently reactive attachment disorder manifests itself in behavioral issues such as lying. During cross-examination, however, the prosecutor effectively contested Veraldi's testimony. The prosecutor elicited from Veraldi that not all children diagnosed with reactive attachment disorder lie or fabricate information; that Veraldi had not actually evaluated T.W.; and that Veraldi had, in fact, little basis to conclude that in T.W.'s case her disorder manifests itself through lying or causes her to fabricate information.

¶8      In her closing argument, the prosecutor emphasized that T.W. was in a "stable and loving home" at the time of the alleged incident and T.W.'s disorder was simply a "red herring" manufactured by the defense to distract from Weisbarth's culpability:

5

> The Defense wants to attack her. She's an angry child with reactive attachment disorder. Cannot tell the truth. . . . Dr. Veraldi, what assistance did she give you with that? Nothing. She told you that children with reactive attachment disorder can have a propensity to be [un]truthful. She's never evaluated this victim.
>
> .  .  .
>
> And think about this, ladies and gentleman, when you're evaluating [T.W.], what motive does she have to lie? . . . She was safe. [Roy] had permanent guardianship. She was home. She had no reason to fabricate this abuse.

The prosecutor further emphasized throughout her closing argument the lack of evidence that T.W.'s disorder manifests itself through lying:

> I think what's telling, ladies and gentlemen, is Defense Counsel wants you to think that [T.W.] was lying, that she has reactive attachment disorder and was lying. There's no evidence to suggest that [T.W.] exhibited any symptoms of lying. The only person, in fact, that tells you that she was lying was the Defendant. He has to have you believe she was lying, but there's no evidence to support that.

¶9 The jury found Weisbarth guilty of felony incest. The District Court sentenced Weisbarth to 100 years in the Montana State Prison, with 50 years suspended and no parole eligibility for the first 25 years.

¶10 After the conclusion of trial, Weisbarth was able to gain access to the sealed medical records. The medical records provided evidence that T.W. suffers from psychosis; that T.W.'s disorder manifests itself through lying; that T.W.'s living situation at the time of the alleged incident was unstable and may have caused her symptoms to worsen; that Roy reduced T.W.'s medication below the recommended therapeutic levels around the time of the alleged incident; and that T.W. may have previously made and then recanted an allegation of sexual abuse against her mother.

6

*Evidence of Psychosis*

¶11    The State redacted information in the medical records showing T.W.'s disorder causes her at times to lose contact with reality.  The medical records show Krajacich diagnosed T.W. with "psychotic intrusions" in the spring of 2011.  Krajacich noted T.W. suffers from "command hallucinations" in which various figures—including her teddy bear, Sponge Bob, and her step-brother—tell her to do inappropriate things.  Krajacich noted that, while not conclusive, the results of his testing suggest a "breakdown in reality."  Krajacich believed T.W.'s condition was so severe that he considered whether she should be placed in a children's hospital for "psychiatry" services, potentially Intermountain Children's Hospital in Helena or a similar specialized program or in Virginia.

¶12    The medical records also reveal that Pike confirmed Krajacich's initial diagnosis. The medical records show Pike prescribed 2 milligrams of Intuniv to treat T.W.'s mood disorder in February 2011, and approximately six months before the alleged incident, in March 2011, Pike considered prescribing antipsychotic medication to T.W., noting that the medication may be necessary if T.W. continued to suffer from psychotic symptoms.

*Evidence of Lying*

¶13    The State redacted information in the medical records showing T.W.'s disorder manifests itself through lying.  Krajacich noted that T.W. is very smart but, as a result of her disorder, "struggle[s] enormously with behavioral issues."  Krajacich reported that her grandparents complained of terrible deceptive behavior, that "she lies about a number of things," and that she "make[s] stuff up on the spot."  Pike similarly explained T.W.'s

disorder manifests itself through lying, noting that T.W. "lies a lot of the time" and has "problems with lying."

*T.W.'s Tumultuous Life Circumstances*

¶14    The State redacted information in the medical records showing T.W.'s living situation was unstable and may have worsened her symptoms. Pike noted that, in September 2011—around the time of the alleged incident—T.W.'s step-grandmother, Gina, was divorcing Roy after seven and one-half years of marriage. Pike noted that Gina had kicked Roy and T.W. out of the family home; Gina was afraid Roy was going to kill her; and Roy and T.W. had been forced to live in a fifth-wheel RV trailer. Dr. Pike further noted that, in the midst of all this, T.W.'s German shepherd had died. The medical records reveal that Pike was seriously concerned T.W.'s tumultuous life circumstances may cause her symptoms to worsen. Pike noted "the current circumstances could potentially be fairly stressful for [T.W.] and further her fears of abandonment and attachment problems."

*Medication*

¶15    The State redacted information in the medical records showing Roy began reducing T.W.'s medication below therapeutic levels around the time of the alleged incident without approval from Pike. Pike noted that, sometime before March 2013, Roy started reducing T.W.'s Intuniv dosage. According to the medical records, Roy believed that the medication was making T.W. drowsy so he reduced her Intuniv dosage by half, giving her 1 milligram per day instead of the prescribed 2 milligrams. After learning that Roy was reducing T.W.'s dosage, Pike admonished Roy for doing so and warned him

against altering T.W.'s medication again in the future. Pike explained to Roy that "cutting it in half can destroy the long term effects" of the medication. Roy later acknowledged to Dr. Pike that T.W. needs the full 2 milligrams because "anything less does not work" and "there are problems when she is not taking it" as prescribed.

*False Accusation of Sexual Abuse*

¶16 Finally, the State redacted information in the medical records regarding a potential allegation of sexual abuse. Krajacich noted that T.W. had a few overnight visits with her mother and her mother's boyfriend. Krajacich's report states:

> The first overnight visit seemed to go fairly well, but the second visit seemed to be more difficult for [T.W.]. She claimed that she had seen sexual behavior between mother and [boyfriend], and Roy and Gina are really suspicious about whether that is really a real observation versus "something pretend." *[T.W.] initially said that something happened to her also, but again, she then backed away from that later.* Therefore, they are not really sure what has gone on.

(Italics in original.)

¶17 After obtaining T.W.'s medical records, Weisbarth appealed his conviction.

**STANDARDS OF REVIEW**

¶18 *Brady* claims not contained within the trial record are reviewed under the plain error authority of § 46-20-701(2)(b), MCA. *State v. Ellison*, 2012 MT 50, ¶ 12, 364 Mont. 276, 272 P.3d 646. A motion to dismiss charges based on the State's suppression of exculpatory evidence is a question of law. *State v. Duncan*, 2008 MT 148, ¶ 17, 343 Mont. 220, 183 P.3d 111. We review conclusions of law for correctness. *Valley Bank v. Hughes*, 2006 MT 285, ¶ 15, 334 Mont. 335, 147 P.3d 185.

9

¶19 *Whether Weibarth is entitled to a new trial based on the State's failure to disclose T.W.'s medical records.*

¶20 Weisbarth argues that the State's suppression of the medical records violated his right to due process. He maintains that the records clearly contained evidence favorable to his defense and prejudice ensued from the State's failure to disclose the medical records. Under the landmark case of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, (1963), the prosecution is constitutionally obligated to provide any exculpatory or impeachment evidence in its possession to the defense. We have explained that a party seeking to establish a *Brady* violation must establish: (1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the prosecution suppressed the favorable evidence; and (3) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different. *McGarvey v. State*, 2014 MT 189, ¶ 16, 375 Mont. 495, 329 P.3d 576. We have further explained that even if the foregoing elements are satisfied, there is no *Brady* violation if the petitioner could have obtained the exculpatory evidence with reasonable diligence. *McGarvey*, ¶ 16.

*I. Favorable Evidence*

¶21 We agree with Weisbarth that the medical records contained evidence favorable to his defense. Although the evidence differs in kind, it all shares a common feature: it impugns T.W.'s credibility. Clearly, all of the evidence in the medical records concerning T.W.'s mental health casts doubt on T.W.'s ability to credibly recall the

alleged incident. This is "classic impeachment evidence." *Browning v. Trammell*, 717 F.3d 1092, 1105 (10th Cir. 2013). "A witness's credibility may always be attacked by showing that his or her capacity to observe, remember, or narrate is impaired." *Browning*, 717 F.3d at 1105 (citing 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 607.05[1] (Joseph M. McLaughlin ed., 2d ed. 2014)). The evidence of T.W.'s problems with lying was valuable to the defense for impeachment purposes. While under M. R. Evid. 403, a court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, needless presentation of cumulative evidence, waste of time, undue delay, or misleading the jury, it is well-settled law that evidence of a witness having previously lied is favorable evidence that the defense may use for impeachment purposes absent a determination of inadmissibility pursuant to Rule 403. *See State v. Passmore*, 2010 MT 34, 355 Mont. 187, 225 P.3d 1229. Thus, the evidence of T.W.'s mental health and the related evidence of T.W.'s problems with lying were favorable evidence for the defense.

¶22 The evidence of the prior accusation of sexual abuse, however, presents a more difficult question because of the potentiality of invoking Montana's Rape Shield Statute, § 45-5-511, MCA, *et seq*. Krajacich's report documented the potential prior accusation of sexual abuse. We have recognized that a complaining witness's prior false accusation of a sexual offense "may often be probative of the complaining witness' specific reputation for untruthfulness." *State v. Anderson*, 211 Mont. 272, 283, 686 P.2d 193, 199 (1984). However, such evidence is admissible only if the accusation has been "proven or

admitted to be false." *State v. Ring*, 2014 MT 49, ¶ 17, 374 Mont. 109, 321 P.3d 800. In order to establish whether a contention is false, we require the trial court to conduct a separate hearing outside of the jury's presence. *Ring*, ¶ 17. The hearing must address whether it is proper to question the witness regarding a previous accusation, as well as the admissibility of corroborating evidence. *Ring*, ¶ 18. Here, because the State failed to disclose to the defense T.W.'s prior accusation, the defense was unaware and thus unable to initiate the process set forth above to obtain a determination of whether the accusation was admissible. The defense, through the State's actions, was prevented from obtaining a judicial ruling regarding whether the accusation was proven or admitted to be false and whether any corroborating evidence may have been admissible. Further, without the benefit of the requisite hearing and further evidence presented, this Court is unable to review on appeal whether Krajacich's report documenting the prior accusation of sexual abuse was admissible.

¶23 The State argues that inadmissibility of the evidence is dispositive in determining whether the evidence should have been disclosed under *Brady*. The State reasons, that for purposes of *Brady*, inadmissible evidence cannot be considered favorable evidence because it cannot be used by the defense at trial. We have never squarely addressed whether inadmissible evidence can properly be considered *Brady* evidence. However, the majority of courts that have addressed the issue have concluded that inadmissible evidence can constitute *Brady* evidence. *See Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003); *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002); *Maynard v. Gov't of Virgin Islands*, 392 F. App'x 105, 115-16 (3d Cir. 2010); *United States v. Sipe*, 388 F.3d 471,

12

485 (5th Cir. 2004); *Sawyer v. Hofbauer*, 299 F.3d 605, 614 (6th Cir. 2002); *United States v. Asher*, 178 F.3d 486, 496 (7th Cir. 1999); *Madsen v. Dormire*, 137 F.3d 602 (8th Cir. 1998); *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999).

¶24 We agree with the majority of courts that have addressed the issue. The focus of the inquiry should not be on whether the evidence is admissible or inadmissible, but rather whether the evidence is favorable to the defense and could have affected the outcome of the proceedings. We decline to develop a rule that would foreclose the development of defense strategy and investigation or to presuppose what information the defense may have developed as a result of properly disclosed evidence. In light of the policy underlying *Brady*, we believe that even inadmissible evidence could have "substantial value to the defense that elementary fairness requires it to be disclosed." *United States v. Agurs*, 427 U.S. 97, 110, 96 S. Ct. 2392, 2401 (1976). Here, although Krajacich's report may have been inadmissible for any number of reasons, at the very least disclosure of the report had substantial value to the defense given its potential to lead directly to admissible exculpatory evidence. We therefore conclude that Krajacich's report constituted favorable evidence within the meaning of *Brady*.

¶25 In sum, we agree with Weisbarth that the medical records contained favorable evidence to his defense. After obtaining the medical records, the State should have disclosed the substance of the records to Weisbarth. Thereafter, any concerns of the State regarding privacy rights of the victim, relevancy, and inadmissibility under the Rape Shield Statute, could be subsequently raised and considered by the District Court. We

13

therefore turn to the question of whether the State's failure to alert Weisbarth of the substance of the records caused him prejudice.

*II. Prejudice*

¶26    In order to establish prejudice, Weisbarth must show that the undisclosed evidence was material to his defense.  Evidence is material for purposes of *Brady*, if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995).  "The materiality of excluded evidence is considered collectively, not item by item." *McGarvey*, ¶ 17.  Further, "[i]mpeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *United States v. Price*, 566 F.3d 900, 914 (9th Cir. 2009).

¶27    T.W. was unquestionably the State's most important witness.  In contrast to the other circumstantial evidence with arguably minimal value, T.W.'s testimony provided direct testimonial evidence of Weisbarth's guilt.  With the significant redactions made by the State in T.W.'s medical records, the defense was unable to seriously challenge her testimony and the jury had little reason to doubt her memory or truthfulness.  The prosecutor exploited this throughout her closing argument.  The prosecutor emphasized that T.W. was in a safe environment and had no reason to fabricate:

> Now, look at the timing of the disclosure, and the sexual abuse that occurred, not until 2012.  This isn't an ongoing custody dispute that she'd like to get out of that situation.  She was safe. [Roy] had permanent guardianship.  She was home.  She had no reason to fabricate this abuse.

The prosecutor further emphasized the lack of evidence demonstrating untruthfulness:

14

I think what's telling, ladies and gentlemen, is Defense Counsel wants you to think that [T.W.] was lying, that she has reactive attachment disorder and was lying. There's no evidence to suggest that [T.W.] exhibited any symptoms of lying. The only person, in fact, that tells you that she was lying was the Defendant. He has to have you believe she was lying, but there's no evidence to support that.

Weisbarth, of course, did not have any information to rebut the prosecutor's narrative and to give the jury any evidence to question T.W.'s credibility. That information the prosecutor concealed. The State did not reveal the evidence of T.W.'s psychosis, her history of lying, or the prior allegation of sexual abuse. Nor did the State reveal the evidence in the medical records showing that T.W.'s life was in a state of upheaval at the time of the allegation and that her grandfather had altered her medication below therapeutic levels around the time of T.W.'s disclosure.

¶28 Had Weisbarth been able to discredit T.W.'s testimony with this evidence, there is a reasonable probability that he could have persuaded the jury that T.W. fabricated the allegations against him. By using the lack of any evidence casting doubt on T.W.'s credibility against the defense, the prosecutor further heightened the medical records' impeachment value and the defense's need for the suppressed evidence. Absent the concealed evidence, T.W.'s testimony firmly established Weisbarth's guilt in the eyes of the jury and rendered his ability to undermine the State's case exceedingly difficult. If the State had provided the evidence to the defense, Weisbarth would have been in a position to seriously challenge T.W.'s credibility through cross-examination and the direct testimony of Veraldi. In short, the undisclosed evidence in question "could reasonably be taken to put the whole case in such a different light as to undermine

15

confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566. We conclude therefore that the State's suppression of the medical records was prejudicial to the defense.

### III. Reasonable Diligence.

¶29 The State further argues that the medical records do not establish a *Brady* violation because it is unclear "what information the defense could have obtained with the exercise of reasonable diligence." Citing the Ninth Circuit Court of Appeals' decision in *Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir. 2014), Weisbarth counters that a prosecutor's obligation under *Brady* is not excused by defense counsel's failure to exercise diligence with respect to suppressed evidence. Alternatively, Weisbarth argues that he exercised reasonable diligence in attempting to obtain the medical records.

¶30 We have on several previous occasions refused to find a *Brady* violation where the defense could have obtained the exculpatory evidence through the exercise of reasonable diligence. *See, e.g.*, *State v. James*, 2010 MT 175, ¶ 34, 357 Mont. 193, 237 P.3d 672; *State v. Parrish*, 2010 MT 212, ¶ 21, 357 Mont. 477, 241 P.3d 1041; *McGarvey*, ¶ 18. We acknowledge that this precedent is now seemingly at odds with that of the Ninth Circuit. *Amado*, 758 F.3d at 1136 (concluding that the requirement of due diligence is contrary to federal law as clearly established by the Supreme Court and unsound public policy). (Internal citation omitted.) However, we nonetheless decline to address the apparent conflict or revisit our previous decisions here. Because we believe that Weisbarth exercised reasonable diligence in this instance, it is unnecessary to do so. Here, Weisbarth had no way of knowing what evidence the medical records contained

16

and he did the only thing he could do to obtain the records by filing a motion with the District Court requesting their disclosure. The court granted the motion and ordered the State to produce the records. The State then represented, on the eve of trial, that it had produced all discoverable material from the medical records. Weisbarth was entitled to rely on the State's representation. *See Banks v. Dretke*, 540 U.S. 668, 674, 124 S. Ct. 1256, 1263 (2004). In short, Weisbarth exercised due diligence in attempting to gain the records; the State thwarted those efforts.

¶31 As a final matter, the State argues that pursuant to *State v. Johnston*, 2014 MT 329, 377 Mont. 291, 339 P.3d 829, rather than reversing Weisbarth's conviction, the proper remedy is to dismiss the appeal without prejudice and remand to the District Court for an *in camera* inspection of the medical records. We disagree. In *Johnston*, the district court erred by denying disclosure of confidential state agency records without first reviewing the records for exculpatory evidence, and we remanded the case to the district court to conduct an *in camera* review of the records. *Johnston*, ¶ 10. We did so, however, because the records were still in the agency's possession and not in the record on appeal. *Johnston*, ¶ 4. Here, T.W.'s medical records are part of the record on appeal. Thus, because the medical records are reviewable on appeal, there is no need to remand to the District Court.

## CONCLUSION

¶32 We realize that child abuse is one of the most difficult crimes to prosecute, in large measure because there are often no witnesses except the victim. We acknowledge as well that there is something innately human about wanting to protect a young child from her

17

abuser and the release of her personal information. In our system of justice, however, prosecutors occupy a unique position of public trust and their obligations extend beyond the protection of the victim. Prosecutors must ensure above all else that justice is done which necessarily requires that they provide a defendant, regardless of the nature of the offense, due process of law. For the foregoing reasons, we are not convinced that this occurred here.

¶33    Reversed and remanded.


                                   /S/ LAURIE McKINNON


We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT