FILED

04/13/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0346

DA 19-0346

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 92N

STATE OF MONTANA,

    Plaintiff and Appellee,

    v.

DAVID THOMAS WEISBARTH, II,

    Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and For the County of Cascade, Cause No. CDC 13-062
                Honorable John A. Kutzman, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Caitlin Boland Aarab, Boland Aarab PLLP, Great Falls, Montana

        For Appellee:

            Austin Knudsen, Montana Attorney General, Tammy K Plubell, Assistant
            Attorney General, Helena, Montana

            Joshua Racki, Cascade County Attorney, Jennifer Quick, Amanda Lofink,
            Deputy County Attorneys, Great Falls, Montana

                                Submitted on Briefs:  February 24, 2021

                                           Decided:  April 13, 2021

Filed:

            _____
                              Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2     David Thomas Weisbarth, II appeals from his conviction by a jury of the offense of incest pursuant to § 45-5-507, MCA. This is Weisbarth's second appeal. We reversed and remanded his first conviction for a new trial. *State v. Weisbarth*, 2016 MT 214, 384 Mont. 424, 378 P.3d 1195. We affirm.

¶3     Prior to trial, the District Court held a *Mazurek*[1] hearing on the State's motion in limine to prevent Weisbarth from soliciting testimony in violation of Montana's Rape Shield Statute, § 45-5-511, MCA. At the hearing, T.W.'s grandfather Roy Dittler (Roy), Dr. Thomas J. Krajacich (Krajacich), and T.W.'s mother Gretchen Dittler all testified. Roy testified that T.W. told him she saw her mother and mother's boyfriend "playing horsey." Krajacich evaluated T.W. at the request of her family physician. Roy told Krajacich, who then recorded the information in his chart as follows:

> The first overnight visit seemed to go fairly well, but the second visit seemed to be more difficult for [T.W.]. She claimed that she had seen sexual behavior between her mother and [boyfriend], and Roy and Gina are really suspicious about whether that is a real observation versus "something pretend." *[T.W.] initially said that something happened to her also, but again, she then backed away from that later. Therefore, they are not really sure what has gone on.*

---

[1] *State ex. rel. Mazurek v. Dist. Court of the Mont. Fourth Judicial Dist.*, 277 Mont. 349, 922 P.2d 474 (1996).

*Weisbarth*, ¶ 16 (emphasis in original). In his testimony, Roy admitted that he was a "dirty old sailor" and that he may have been mistaken as to what T.W. meant by "playing horsey." T.W. was present during the appointment when Roy told Krajacich but did not participate. Krajacich acknowledged that he did not intend the chart notes to be a verbatim transcription of what Roy told him. Krajacich agreed that Roy may have used the words "playing horsey." The District Court held that while testimony supported the idea that Roy personally believed T.W.'s statement was sexual in nature, "The record does not establish what T.W. meant by 'playing horsey.' Neither does the record establish that Gretchen and her new boyfriend did not engage in innocuous *non*-sexual behavior that a four-year-old might describe as 'playing horsey.'" (Emphasis in original.) Furthermore, the District Court held that, "Mr. Weisbarth has not carried his burden of proving the May 2011 'playing horsey' remark was (a) an accusation about sexual conduct, or (b) that it was false." The court granted the State's motion in limine.

¶4 T.W. testified at trial. The trial occurred approximately six years after Weisbarth sexually abused her. At the time of trial, she was 11 years old. T.W. testified that she understood what it meant to tell the truth and explained the importance of doing so. She then described Weisbarth sexually abusing her. Weisbarth gave T.W. something to eat, and then she went into the bathroom. Weisbarth followed her and pulled T.W.'s pants down, "pressed on [her] privates," penetrated her vagina with his hand, and then told her to "pull his pants down and do the same thing to him." T.W. refused to comply. On

3

cross-examination, T.W. described aspects of Weisbarth's apartment, although she could not remember many of the details. T.W. elaborated about Weisbarth's abuse.

¶5 Roy testified about his relationship to T.W. as her grandfather and eventually her legal parent. Roy testified further about the counseling that T.W. was participating in. He explained that T.W. began counseling when she was about four years old. Roy felt that T.W. had anger issues related to her past. With counseling and strong family support, T.W. improved significantly and "[a] kinder, more gentle person started to evolve." Roy explained that T.W.'s negative behaviors dissipated by August 2012, and that Roy "never doubted [T.W.'s] word."

¶6 In November 2013, T.W. told Roy that her "pee-pee [hurt]" and asked Roy to "kiss it better." Roy told T.W. that it would be inappropriate. Soon after, following a visit with her therapist, T.W. told Roy that she was afraid of Weisbarth. Roy stopped allowing T.W. to have visits with Weisbarth without Roy present. Rather than delving into the issues surrounding the circumstances with Weisbarth and T.W. right away, Roy decided to let T.W.'s therapist address it during the next session.

¶7 On cross examination, Roy described T.W.'s behavior during her younger years. Roy admitted that T.W. was not always honest. Roy testified that although he went through a divorce in the fall of 2012. T.W.'s home life was not in an upheaval at that time, and Roy's ex-wife Gina was still involved in T.W.'s life. In early January T.W. told her mother Gretchen about Weisbarth's sexual abuse. Gretchen informed Roy of the abuse. Roy explained that T.W. had no reason to lie about the sexual abuse because she was already

4

living with Roy, and allegations of the abuse would not have changed T.W.'s living circumstances.

¶8    T.W.'s therapist Lisa Anderson (Anderson) testified that T.W. first came to her for care in March 2012. At that time, T.W. had two diagnoses, reactive attachment disorder (RAD) and attention deficit hyperactivity disorder. As T.W. progressed in her treatment, Anderson felt that the RAD diagnosis was not appropriate for T.W. as she did not exhibit the necessary criteria. Eventually, T.W. began treatment for post-traumatic stress disorder. T.W. disclosed the sexual abuse by Weisbarth to her therapist in January 2013. T.W. did not exhibit symptoms of RAD during Roy's divorce, at the time she was abused, nor during the period when she disclosed the sexual abuse.

¶9    On January 18, 2013, Detective Noah Scott (Scott) conducted the forensic interview of T.W. Scott outlined the protocols for interviewing young children, which includes repeating what the child says back to them to verify accuracy and ensure that people listening can hear the statement. Scott's entire interview with T.W. was published to the jury.

¶10   Scott also interviewed Weisbarth during his investigation. Weisbarth disclosed some information that concerned Scott including that he had sexual thoughts about T.W., and that he failed to have concern for T.W. regarding possible sexual abuse. For instance, Weisbarth told Scott that he was giving T.W. a bath when she was two years old and had inappropriate thoughts although he never acted on his fantasies. When asked about sexual abuse Weisbarth had experienced as a child, he told Scott, "Do I have a problem, yes. Have

5

I had thoughts, yes. I will admit that. I was actually, I was molested when I was a child by a neighbor. And yes I have had the thoughts."

¶11 Scott asked Weisbarth about inappropriate thoughts about T.W. specifically, "What about times that you think are inappropriate?" Weisbarth responded, "The only times that I ever had the thought of this inappropriate was when I was giving her a bath. Like I said, I don't even know for sure if I was turned on or not. I don't know why that thought popped into my head." Scott also investigated Weisbarth's electronic devices and Scott did not find any evidence of child pornography. Weisbarth did not admit during the interview to sexually abusing T.W., although he did corroborate T.W.'s testimony about what he fed her on the day of the abuse.

¶12 After testifying at the pretrial hearing, Krajacich testified at trial that T.W.'s family physician asked him to evaluate T.W. Krajacich diagnosed T.W. with RAD. He explained RAD, and the two types of RAD that are prevalent. Krajacich acknowledged that RAD can improve and eventually go away if a child is placed in a stable environment. Krajacich acknowledged that children who sometimes tell "white lies" are also capable of telling the truth and that often when they are confronted, they will admit the truth after lying.

¶13 Weisbarth argues that the District Court erred in concluding that T.W.'s statement about her mother and mother's boyfriend "playing horsey" was not an allegation of sexual misconduct, and that T.W.'s statement was an allegation because of Roy's interpretation of the statement. Weisbarth argues further that the court erred in preventing him from cross-examining T.W. about the alleged prior allegation of sexual misconduct.

6

¶14 We review evidentiary rulings for an abuse of discretion. *State v. Ring*, 2014 MT 49, ¶ 12, 374 Mont. 109, 321 P.3d 800 (citation omitted). To the extent that a district court's ruling is based on a conclusion of law, this Court's review is de novo. *Ring*, ¶ 12 (citation omitted).

¶15 There is a conflict between a defendant's right to confront his accuser arising from the Sixth Amendment to the United States Constitution, and a victim's right to protection under the Rape Shield Law. *State v. Colburn*, 2016 MT 41, ¶ 24, 382 Mont. 223, 366 P.3d 258. It is the trial court's responsibility to strike a balance between the defendant's right to present a defense, and a victim's right under the Rape Shield Law. *Colburn*, ¶ 25. As such, evidence of a false sexual accusation may be admissible after a separate hearing inquiring into whether the witness made a prior false accusation of sexual misconduct. *Weisbarth*, ¶ 22 (*citing Ring*, ¶ 17). At the hearing, the defendant must establish by a preponderance of the evidence that (1) the accusation or accusations were in fact made; (2) that the accusation or accusations were in fact false; and (3) that the evidence is more probative than prejudicial. *Ring*, ¶ 18 (*quoting Mazurek*, 277 Mont. at 358, 922 P.2d at 480).

¶16 The District Court held a pretrial hearing to evaluate the evidence presented by the defense regarding the supposition that when T.W. told Roy that Gretchen and her boyfriend were "playing horsey," it was a sexual allegation. The District Court heard testimony, evaluated the record, and found that there was no prior allegation of sexual misconduct. We agree. While Roy clearly believed, at least initially, that "playing horsey" was sexual in nature, he also admitted that he was a "dirty old sailor" and that he could have been

7

mistaken as to what T.W.'s statement meant. Moreover, T.W. did not personally make any statements of this nature to Krajacich. Only Roy told Krajacich about the "playing horsey" statement, and only Roy interpreted that statement. Krajacich's musings in the report regarding the statement after Roy's disclosure do not amount to evidence of a prior allegation of sexual misconduct by T.W. Moreover, the term "playing horsey" does not evoke ideas of a sexual nature. The District Court was correct in concluding that the evidence presented did not support the theory that T.W. made a prior allegation of sexual misconduct. As a threshold matter, it was not established by a preponderance of the evidence that an accusation was in fact made. Thus, the second and third prongs of the *Mazurek* test were not satisfied.

¶17 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶18 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

8