FILED

10/05/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0301

DA 19-0301

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 255

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

TODD CARLISLE FISHER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Dawson, Cause No. DC 2017-090
Honorable Michael B. Hayworth, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

          Chad Wright, Appellate Defender, Kristina L. Neal, Assistant Appellate
Defender, Helena, Montana

       For Appellee:

          Austin Knudsen, Montana Attorney General, Tammy K Plubell, Appellate
Bureau Chief, Katie F. Schulz, Assistant Attorney General, Helena,
Montana

          Brett J. Irigoin, Dawson County Attorney, Glendive, Montana

Submitted on Briefs:  July 28, 2021

Decided:  October 5, 2021

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Todd Carlisle Fisher (Fisher) appeals a March 14, 2019 order from the Seventh Judicial District Court in Dawson County denying his motion to dismiss the deliberate homicide case against him. Fisher also appeals his jury conviction and the judgment and sentencing order.

¶2      We restate the issues on appeal as follows:

*Issue One: Were Fisher's due process rights violated by the State's conduct investigating and releasing the crime scene?*

*Issue Two: Did the prosecutor's comments at trial improperly distort Fisher's presumption of innocence and the State's burden of proof?*

*Issue Three: Did the District Court err when it ordered Fisher to pay his public defender fees?*

¶3      We affirm as to Issues One and Two and reverse and remand on the matter of Issue Three.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4      The medical examiner estimated Wilbur Fisher's time of death as Saturday evening, October 14, 2017. He was shot in the face in his bed. Wilbur was the father of Todd Fisher (Fisher). They lived together in an isolated area not far from Glendive, on a 320-acre property of rolling pastureland draining into Sevenmile Creek on its way toward town. Wilbur had a horse and a cat. He was 80 years old and a triple amputee since an electrical accident in the 1960s. His physical and mental fitness were a matter of minor conflict at trial.

¶5 On Monday morning, October 16, Fisher called 911 to report discovering his father's body. He stated several details: "I've been on the river bottoms for two days . . . the side door was kicked in . . . and the gun, the .237 . . . is missing." Fisher then said his dad had been murdered. The dispatcher testified she found Fisher's lack of urgency and delayed detail of the death unusual.

¶6 When a deputy arrived, Fisher calmly repeated his impression of the scene and his whereabouts before that morning. Dawson County Sheriff Ross Canen and other deputies arrived that same day, and they arranged for the state Division of Criminal Investigation (DCI) to send personnel to assist the investigation. Sheriff Canen took Fisher to Glendive for an interview that afternoon, then put Fisher up in a hotel room that night while investigators probed the house.

¶7 DCI agent Jeremy Waldo directed the collection of evidence. The process lasted into late Tuesday evening. An officer had watched the crime scene overnight between Monday and Tuesday, but all authorities were off the property after Waldo concluded work Tuesday night. Sheriff Canen interviewed Fisher again on Tuesday but did not arrest him. Fisher stayed at the hotel again that night. Wednesday morning, with the investigators' work complete, the sheriff drove Fisher back to the house, where he remained for two nights.

¶8 On Thursday, agents interviewed other potential suspects and collected information. On Friday, back on the property, the sheriff and deputies arrested Fisher. They left the keys to the house in the kitchen.

¶9 Fisher was charged with deliberate homicide and felony tampering with evidence. The State's case relied on oddities in his behavior, physical evidence, and his personal and financial motives for the crime. Waldo and his investigators concluded that the scene looked more like a staged burglary: the busted-in side door was damaged only from the inside, and though Wilbur's safe was ajar, rooms were tidy and valuable items undisturbed. Fisher's narrative under questioning changed or contradicted itself several times, and he spun an unlikely hypothesis of a CIA plot.

¶10 Fisher and his father had fought. Fisher had little income, from social security and cutting firewood, and he clashed with his father over financial support, over his own mental health, and over caregiving for Wilbur's physical health. Wilbur was in decline but dismissed Fisher's wishes to move him to a home. The gun Fisher said was missing from the kitchen lay in the bushes outside the house, one cartridge spent. Tests showed gunshot residue on Fisher's jeans and sweatshirt. The prosecutor told the jury the case was "sadly, sadly simple," describing Fisher violently snapping under the stress.

¶11 Fisher's defense hammered evidentiary defects and a narrative about an alternative suspect: Sheriff's Deputy Brett Hoagland. Hoagland and his wife lived along Sevenmile Creek, about a mile and a half from the Fishers. Their land was smaller, so they pastured their draft horses on Wilbur's acreage. After some years of friendship, Hoagland had heard Wilbur might have named him in his will. That was apparently true: the Hoaglands were the secondary beneficiaries after Fisher. When Hoagland mentioned this on Monday, Sheriff Canen ordered him to refrain from any work on the case.

4

¶12    On Friday, however, with Fisher behind bars, Sheriff Canen told Hoagland he could go back to the property to check on his horses and on Wilbur's horse and cat. The sheriff also recommended Hoagland lock up the place—for one thing, the door had been removed by Waldo's team. Hoagland and Sheriff Canen stressed he was there off the clock, in his capacity as friend and neighbor to the deceased.

¶13    Hoagland did more than lock the door. The bedroom remained bloody, and things stank. Worried about what rodents and bugs would do, Hoagland called a janitorial service. The service came on Saturday and deep-cleaned the bedroom. It was the same janitorial company the department typically used for crime scenes, and the cleaner initially thought it was an official job. He later billed Wilbur's estate, however, and mailed the invoice to Hoagland's personal address.

¶14    Agent Waldo heard about Hoagland's clean-up a couple days later and said he was pretty upset: "I felt like it was a boneheaded move, and that he had created a lot of problems for himself and this investigation."

¶15    Fisher agreed. Fisher argued Hoagland was a suspect with financial motive to kill and that he had scrubbed the scene of evidence that could dispute Fisher's guilt. Prior to trial, Fisher filed a motion to dismiss the charges against him, citing his constitutional due process rights to have access to exculpatory evidence. The District Court held a thorough hearing on the matter but concluded that the timing of the release of the crime scene, Hoagland's lack of "state actor" status that Friday and Saturday, and the absence of bad faith vitiated any due process concerns.

¶16    At trial, Fisher's attorneys developed the Hoagland narrative. They cited Fisher's diagnosis of Tourette's syndrome and the possibility of Asperger's to explain his impassive temperament and his non-linear or fantastic explanations. They stressed that Wilbur provided for Fisher, downplaying financial tensions or Fisher's cognizance of any potential windfall. And they excoriated the State for sloppy treatment of the crime scene.

¶17    In addition to taking photographs, Fisher argued, Waldo's team should have preserved the bed sheets and items like Wilbur's prosthetics that were spattered in blood. These were lost to Hoagland's cleaners. And Waldo concluded without collecting and preserving trace evidence—hairs and other tiny samples Fisher speculated could exonerate him—from the broader scene of the crime. Fisher also questioned if investigators did enough to pursue fingerprint comparisons.

¶18    One reason the prosecution did not rely on fingerprint evidence was that analysts had lifted only one usable print, from the handle of Wilbur's safe. They could not say whether it was Fisher's or someone else's because authorities could not get accurate fingerprint samples from Fisher's calloused and stiff fingers, and they had tested no others' prints for comparison with the print on the safe.

¶19    Fisher called an expert witness at trial who cast doubt on these explanations. The expert said he considered several more prints to be legible. He testified that there were better methods for getting fingerprints from hands like Fisher's, which would have allowed the State to make a comparison that might rule Fisher out. In response to this testimony, the prosecutor questioned the expert why, if superior comparisons were possible, he had not attempted to acquire them.

¶20     Fisher objected to this line of questioning.  His counsel cast the inquiry as an improper attempt by the prosecutor to insinuate that Fisher had the burden of proving his innocence, rather than the other way around.  The judge told the jurors he would allow a "limited inquiry," and he reiterated the State's burden and that Fisher had no duty to bring substantive evidence.  Later, during his final rebuttal statements, the prosecutor repeated his fingerprint analysis counterargument:  if Fisher's expert "said he could have done one," the prosecutor asked, "but, then, he didn't, then the question is: well, why not? . . . [I]f it's so dang important then why didn't [the expert] do it?"

¶21     Fisher's lawyer again objected, and the judge issued another cautionary statement to the jury noting that Fisher "has no burden here."  Fisher appeals this matter as well, asking this Court to remand for a new trial given the taint of improper burden-shifting.

¶22     Trial lasted seven days.  The jury found Fisher guilty of the homicide and of tampering with evidence, for staging a burglary.  At a sentencing hearing a few months later, the District Court imposed a 70-year prison term for the two offenses.  The District Court also ordered Fisher to pay $25,250 in costs for the assistance of assigned counsel. Fish challenges this financial penalty as a violation of requirements in Montana law that courts first inquire into a defendant's ability to pay.

**STANDARD OF REVIEW**

¶23     This Court exercises plenary review over constitutional questions like the scope of due process.  *State v. Fillion*, 2020 MT 283, ¶ 8, 402 Mont. 84, 475 P.3d 725.  We review a lower court's findings of fact to determine whether they are clearly erroneous.  *State v. Colvin*, 2016 MT 129, ¶ 10, 383 Mont. 474, 372 P.3d 471.

7

¶24 We review legal questions about prosecutorial error de novo, considering the context of the entire proceeding and the impact on a defendant's substantial rights. *State v. Labbe*, 2012 MT 76, ¶ 11, 364 Mont. 415, 276 P.3d 848; *State v. Lawrence*, 2016 MT 346, ¶ 14, 386 Mont. 86, 385 P.3d 968.

¶25 Criminal sentences are reviewed for legality only. *State v. Hirt*, 2005 MT 285, ¶ 11, 329 Mont. 267, 124 P.3d 147. "A district court's determination of a defendant's ability to pay an imposed fine, fee, cost, or other charge is essentially a finding of fact that this Court will reverse only if it is clearly erroneous." *State v. Hotchkiss*, 2020 MT 269, ¶ 13, 402 Mont. 1, 474 P.3d 1273 (internal quotations omitted).

## DISCUSSION

¶26 *Issue One: Were Fisher's due process rights violated by the State's conduct investigating and releasing the crime scene?*

¶27 Both the United States Constitution and the Montana Constitution assure criminal defendants due process of law. Part of due process includes "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 3446 (1982). The seminal United States Supreme Court case describing this guarantee is *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Challenges like Fisher's are thus often termed *Brady* matters.

¶28 *Brady* concerned prosecutors suppressing evidence favorable to the defense; someone else had confessed to a homicide defendant's crime, and prosecutors kept that to themselves. Failing to turn over such evidence, regardless of the good or bad faith of the State's prosecutors, violates due process because it deprives defendants of a "meaningful

8

opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984); *State v. Giddings*, 2009 MT 61, ¶ 48, 349 Mont. 347, 208 P.3d 363. While Montana statutes governing discovery require the hand-over of *Brady* material and more, in constitutional challenges like Fisher's, the defendant bears the burden of showing three requirements of a *Brady* violation: (1) favorable evidence in State hands; (2) suppression by the State, willful or not; and (3) prejudice to the defendant. *State v. Ellison*, 2012 MT 50, ¶ 16, 364 Mont. 276, 272 P.3d 646.

¶29 Parties have further litigated the contours of all three elements. For example, we include within the concept of "favorable evidence" things with the "potential to lead directly to admissible exculpatory evidence." *State v. Weisbarth*, 2016 MT 214, ¶ 24, 384 Mont. 424, 378 P.3d 1195. However, we also require "more than mere speculation" that evidence would be favorable. *State v. Robertson*, 2019 MT 99, ¶ 33, 395 Mont. 370, 440 P.3d 17. And we have noted that the exculpatory value of lost evidence can be apparent due simply to its centrality in the case and its inherent connection to material questions. *See State v. Halter*, 238 Mont. 408, 777 P.2d 1313 (1989) (concerning a stolen bull, with key branding evidence, lost to slaughter); *State v. Colvin*, 2016 MT 129, 383 Mont. 474, 372 P.3d 471 (concerning a car containing evidence of the distance of a gunshot, which was key to proving or disproving the essential element of intent). Further, while a showing of "prejudice to the defendant" does not require showing the evidence would guarantee acquittal, we do ask "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Robertson*, ¶ 33 (internal quotations omitted); *Colvin*, ¶ 13.

9

¶30 We have also considered different characterizations of what is and is not State suppression. The State has no constitutional duty to *collect* evidence that would assist the defense. *State v. Wagner*, 2013 MT 47, ¶ 26, 369 Mont. 139, 296 P.3d 1142. However, the State cannot "frustrate" the defense's evidence-gathering efforts "through either affirmative acts or their rules and regulations." *State v. Swanson*, 222 Mont. 357, 361-62, 722 P.2d 1155, 1158 (1986); *State v. Saxton*, 2003 MT 105, ¶ 32, 315 Mont. 315, 68 P.3d 721. And when defendants challenge the State's failure to *preserve* exculpatory evidence, we have required that the exculpatory value of the evidence was apparent before its destruction or loss, that the defendant could not have gotten it by other reasonable means, and that the evidence was expected to play a significant role in the defense. *Halter*, 238 Mont. at 413; *see also Trombetta*, 467 U.S. at 489.

¶31 Case law has also evaluated what due process requires for *potentially exculpatory* evidence, evidence with relatively speculative defensive value. For this kind of evidence, we generally look for proof of bad faith on the part of the State. *Giddings*, ¶ 48 (citing *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988)). "Failure-to-collect" or "failure-to-preserve" claims in this category can also only succeed if the State acted with bad faith, for example out of animosity to the defense or to deceptively secure conviction. *Miller v. Vasquez*, 868 F.2d 1116 (9th Cir. 1989); *see Bad Faith*, Black's Law Dictionary, 171 (Bryan Garner, 11th ed. 2019) ("dishonesty of belief, purpose, or motive").

¶32 Applied to Fisher's case, all these rules create a series of alternative hurdles: for a true *Brady* claim, Fisher must show that evidence lost from Wilbur's bedroom was favorable to him or had apparent exculpatory value. Without such a showing, the evidence

lost or uncollected was merely *potentially exculpatory*. If the evidence was potentially exculpatory, Fisher must prove bad faith from State investigators. And finally, Fisher's failure-to-preserve and frustration-of-collection arguments regarding potentially exculpatory evidence retain the *Brady* requirement that the evidence lost was in possession of the State.

¶33    Fisher misses the first hurdle because the evidence he lacks cannot be fairly characterized as "exculpatory" in the *Brady* sense. Fisher argues that if Waldo's evidence collection were more thorough before the cleaners scrubbed the room, it might have revealed means to rule out Fisher as the culprit—but this is pure speculation. Fisher conflates exculpatory and potentially exculpatory evidence, and he points generally to the idea that the missing items are self-evidently important, being irreplaceable blood, footprints, or hairs. But unlike in *Halter* and *Colvin*, where the lost evidence was material to both the State's and the defense's cases regarding an essential element of the crime, the evidence Fisher complains is missing was left behind because it was *inessential* to the case absent some new revelation. The fact that Waldo might have missed the bloody footprint of, say, a CIA spy, does not render the carpet favorable or exculpatory—that evidence is *potentially exculpatory* because of the speculation required.

¶34    Fisher misses the next hurdle—bad faith at the collection stage—because he cannot show that Waldo's forensic efforts were limited by bad faith motivations. Although Fisher's defense relied heavily on the inference that the jury might doubt his guilt if the State's evidence could have been more exhaustive, Fisher has done little to argue that the scope of the crime scene investigation was limited in bad faith. In fact, Waldo's decision

11

to call his work complete and vacate the house, allowing Fisher back on the property the following day, is patently inconsistent with any dishonest design to bolster conviction. Releasing the crime scene allowed Fisher or anybody else to damage overlooked evidence. The District Court was correct to credit Waldo's testimony about the value of the evidence collected and the lack of value of any evidence left, and it was correct to conclude that Fisher failed to demonstrate bad faith.

¶35 At the next hurdle, Fisher argues that the actions of Sheriff Canen and Deputy Hoagland were unlawful because they destroyed, failed to preserve, or frustrated his access to the potentially exculpatory evidence. Not only would such arguments hinge on a showing of bad faith, but they also require that a state actor lost evidence in the State's possession. The District Court correctly found the state possession requirement dispositive.

¶36 When Waldo and his investigators left the crime scene Tuesday night and Sheriff Canen returned Fisher home Wednesday morning, the crime scene was "released" and, the State argues, was no longer in its custody. Fisher points out that later, the executor of Wilbur's estate collected keys to the house from the sheriff's office. There had been some confusion in the weeks after Wilbur's death regarding who would watch the house and animals; some of Wilbur's family and the lawyer who drafted Wilbur's will had called but had not requested keys. A neighbor borrowed the keys from the sheriff's department in January to respond to frozen pipes, and the estate lawyer refilled the propane tank. Finally, in February 2018, the co-administrator of Wilbur's estate picked up the keys from the sheriff's department for good. While these events might create some doubt as to who

12

among the neighbors, family, and others involved had control of the property's upkeep, they do not bear on the State's culpability for loss of evidence. As the District Court correctly pointed out, Fisher's complaint hinges on Hoagland's activity the Friday and Saturday after the murder. At that time, Sheriff Canen had left the keys in the house, fully out of State possession, and assumed that someone like the estate attorney was in charge of the property.

¶37 Fisher argues in response that because Hoagland worked as a deputy, he "re-seized" the house on behalf of the State that Friday and Saturday when he ordered the cleaning. The District Court analyzed Hoagland's activities and his testimony that his conduct was "unofficial," and the District Court credited Hoagland's and the sheriff's remarks. We agree. Hoagland went to the property out of uniform, and that Friday was one in a series of vacation days he was not at work at the department. The cleaning company mailed Hoagland, personally, the invoice, billed to Wilbur's estate. Sheriff Canen had told Hoagland he could go to the property when Hoagland called asking about his horses there, wanting to make sure Fisher would not be present if he went to check on them. Sheriff Canen told Hoagland he could check on the animals, and he recommended securing the exposed house, but he did not sanction the clean-up and did not consider the area within the custody of the State.

¶38 What all these circumstances demonstrate is that after October 17, the Tuesday following the murder, Wilbur's property was a former crime scene, returned to Fisher but then left vacant upon his arrest. Subsequent activities with the keys (and Hoagland's cleaning decision that would embroil him in drama) illustrate a community unsure, for a

13

while, who might look after the place. They do not amount to State possession of the property as evidence or State culpability for evidentiary preservation after October 17.

¶39 Because the material Fisher lacked from the crime scene was only potentially exculpatory, because he cannot demonstrate that anything was left behind in bad faith, and because he cannot show State responsibility for its subsequent loss, we affirm the District Court's order finding that Fisher's due process rights were not violated and denying his motion to dismiss.

¶40 *Issue Two: Did the prosecutor's comments at trial improperly distort Fisher's presumption of innocence and the State's burden of proof?*

¶41 The State bearing the burden of proof in a criminal trial is "[o]ne of the fundamental principles of the criminal justice system." *State v. Price*, 2002 MT 284, ¶ 33, 312 Mont. 458, 59 P.3d 1122. Sometimes, a prosecutor may try to skew that burden in the minds of the jury, to give them the impression that a defendant must establish his or her innocence rather than have it presumed absent the State's proof. Such actions violate a defendant's rights and impair "the integrity of the judicial process." *Price*, ¶ 34. Fisher asks us to view the prosecutor's comments about his fingerprint expert as attempting this improper burden-shifting and corrupting his conviction. He points to our language in *State v. Favel*, 2015 MT 336, ¶ 26, 381 Mont. 472, 362 P.3d 1126: "The risk is simply too great that the State's burden of proof in the mind of a juror will be diminished by the repeated use of burden of proof language—such as demonstrate, show, and prove—in reference to what the defendant could have done."

14

¶42    Here, the prosecutor asked Fisher's expert witness whether he had sought any prints to make the comparisons he testified were valuable. When Fisher's counsel objected, the prosecutor responded as follows, with the jury present: "I'm not shifting the burden. I agree the State carries a burden in this case. However, if they're going to raise issues on investigation, and do investigations affirmatively, and say things should have been done, I think it's fair to ask why didn't they do them?"

¶43    Fisher argues that these comments suggested Fisher needed to prove that some incriminating fingerprints were not his, which would be burden-shifting. The State argues that the comments, in contrast, merely aimed to deflate Fisher's claim that the lack of fingerprints was an important source of doubt; they questioned whether that evidence was really as crucial and easily collected as the expert claimed.

¶44    The District Court agreed with the State. When the jury was out of the room, the judge commented to the parties that he "saw the State's questions as a challenge to credibility . . . to the credibility of the actual perceived value of the additional steps that were being advocated by the witness." We concur and affirm that the comments are not cause for retrial. Here, the prosecutor and the judge both reinforced, more than once, that the State bore the burden of proof and that Fisher was presumed innocent, with no duty to bring his own evidence. The prosecutor did not use language stressing Fisher must "demonstrate" or "prove" anything, instead interrogating the expert's claim that the State was wrong to call the fingerprinting inconclusive. By pointing out that the expert had pursued no conclusive comparisons either, the prosecutor was countering the idea that fingerprints mattered, not asking for proof of Fisher's innocence.

15

¶45    *Issue Three: Did the District Court err when it ordered Fisher to pay his public defender fees?*

¶46    Section 46-8-113, MCA, allows district courts to charge convicted defendants with the costs of their attorneys from the public defender's office. However, this law does not permit such charges "unless the defendant is or will be able to pay the costs." Section 46-8-113(4), MCA. We have required that to satisfy this limitation, a sentencing court must first "scrupulously and meticulously examine the defendant's ability to pay." *State v. Gable*, 2015 MT 200, ¶ 22, 380 Mont. 101, 354 P.3d 566.

¶47    Here, after issuing Fisher a 70-year prison sentence, the District Court also ordered him to pay $25,250 in fees for appointed attorneys. The District Court told Fisher this was a diminishment from the total chargeable amount due to his "relatively stifled" earning capacity considering what may be a life sentence. As funds from which Fisher could pay the $25,250, the District Court cited only approximately $11,000 in social security payments that had accumulated in Fisher's account since he was arrested, money potentially subject to recall.

¶48    Fisher argues that this imposition of costs did not follow the scrupulous and meticulous examination we require and argues that any finding that he is able to pay the fines was in error. The State concedes this point on appeal and recommends that the costs be stricken in the interests of justice. We agree with the parties, and we reverse this component of Fisher's sentence and remand with instructions to strike the costs imposed.

## CONCLUSION

¶49     The District Court's March 14, 2019 order denying Fisher's motion to dismiss is affirmed.   Fisher's conviction is affirmed, and the District Court's March 28, 2019 judgment and sentencing order is affirmed.   We reverse the imposition of public defender fees and remand to the District Court to strike payment of the fees from his sentence.


/S/ MIKE McGRATH


We Concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR