FILED

06/14/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0242

DA 20-0242

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 116

STATE OF MONTANA,

Plaintiff and Appellee,

v.

JOURNEY RYDER JOHN WIENKE,

Defendant and Appellant.

APPEAL FROM:     District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADC 2018-177
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Colin M. Stephens, Smith & Stephens, P.C., Missoula, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Helena, Montana

C. Mark Fowler, Attorney at Law, Tumwater, Washington

Leo Gallagher, Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs:  April 20, 2022

Decided:  June 14, 2022

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1    Defendant and Appellant Journey Ryder John Wienke (Wienke) appeals from the March 5, 2020 Judgment and Commitment issued by the First Judicial District Court, Lewis and Clark County, following Wienke's convictions for two counts of deliberate homicide and one count of tampering with or fabricating physical evidence after an October 18-25, 2019 jury trial.

¶2    We address the following restated issues on appeal:

*1.    Whether the District Court abused its discretion by admitting testimony regarding certain text messages at trial.*

*2.    Whether the District Court abused its discretion by refusing Wienke's proposed jury instruction regarding reasonable doubt.*

¶3    We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶4    On the night of March 18, 2018, Wienke, Kyle Hamm (Hamm), and Kaleb Taylor (Kaleb) drove Kaleb's pickup truck to the residence of David and Charla Taylor, Kaleb's adoptive parents, in the Helena Valley.  When they arrived, Hamm, who was driving, stayed in the truck, while Kaleb and Wienke went inside the house.  Wienke carried a knife, while Kaleb was armed with a metal rod.  Once inside, Kaleb brutally attacked his parents in their bedroom with the metal rod.  Charla died in the bed, while David made it to the living room.  Both David and Charla died from a combination of blunt force injuries and multiple stab wounds.  Wienke and Kaleb stole jewelry from the house and then returned to the pickup.

2

¶5     Hamm then drove the three men to the Rods-N-Dogs Car Wash in Helena.  At the car wash, Wienke washed off his shoes, Kaleb, items in the bed of the truck, and the truck itself.  He also dropped a knife on the ground, which Hamm pushed towards the drain with his foot, before Wienke used the spray wand to push the knife further into the drain.  After leaving the car wash, Wienke and Taylor dropped off Hamm at his mother's house, before driving around the Helena area disposing of the metal rod and a bag of jewelry they stole from the Taylors' home.  They also picked up Lakota Salminen (Salminen), Wienke's girlfriend, and gave her some of the stolen jewelry, which she later sold for drugs with Wienke present.  Kaleb, Wienke, and Salminen returned to the Taylors' home later that evening.

¶6     The bodies of David and Charla Taylor were discovered on March 20, 2018.  Kaleb was arrested shortly thereafter, and ultimately confessed to murdering his parents.  Kaleb stated he acted alone, and directed law enforcement to where the metal rod used in the attack and bag of jewelry were hidden.  Law enforcement obtained video from the car wash, which showed Hamm and Wienke disposing of evidence with Kaleb immediately after the murders.  Law enforcement also discovered that Kaleb had stolen $400 from the Lincoln Road RV Park, owned by his parents, on the evening of March 10, 2018, after driving there with Wienke, Hamm, Salminen, and others.

¶7     Wienke was interviewed by Lewis and Clark County Sheriff's Office Detective William Pandis, where he admitted going into the Taylor home with Kaleb.  Wienke said Kaleb told him, "[w]e're gonna go kill my parents" once they got inside, before Kaleb

attacked his parents with the metal rod. Wienke stated both David and Charla were still alive after the initial attack, so he told Kaleb he should not let them suffer and handed Kaleb the knife, which Kaleb used to stab both of his parents several times. Wienke also admitted he helped Kaleb steal things from the house before driving to the car wash. At the end of the interview with Detective Pandis, Wienke was arrested.

¶8 On April 10, 2018, the State filed an Information charging Wienke with two counts of deliberate homicide and one count of tampering with evidence, all felonies. The State amended the Information twice before trial, ultimately filing a Second Amended Information on October 11, 2019, which charged Wienke with: Counts I and III consisting of two counts of deliberate homicide, either under the felony murder rule or by accountability for felony murder, for the deaths of David and Charla during the course of the robbery of the Taylors' home; Counts II and IV, in the alternative to counts I and III, consisting of two counts of deliberate homicide for causing the deaths of David and Charla; and Count V, tampering with or fabricating physical evidence.

¶9 Before trial, Wienke filed a motion in limine, which, as relevant to this appeal, sought to exclude the admission of an 82-page document prepared by the State that included 498 text messages from Wienke, Kaleb, Hamm, Salminen, and others. The texts were from the time period of March 10, 2018, the date Kaleb robbed the Lincoln Road RV Park, until the date of Wienke's arrest. In the motion in limine, Wienke sought to exclude the document's admission on the grounds the text messages were hearsay, not relevant, and violated his constitutional right to confrontation. The State filed a response brief, arguing

4

the text message exhibit had already been admitted during Hamm's trial,[1] and the contents contained within were both relevant and admissible because some texts were not hearsay due to not being offered for the truth of the matter asserted; some were not hearsay because they were admissions by a party opponent, including texts made by Wienke, Taylor, and/or Hamm in the furtherance of a criminal conspiracy; and some were not testimonial.

¶10 The District Court did not rule on Wienke's motion in limine before trial, but invited the parties to provide argument regarding the texts at trial. The parties discussed paring down the State's proposed exhibit to just the texts the State intended to introduce during testimony. Counsel for Wienke asserted each text needed to be analyzed to determine whether a hearsay exception was applicable, and then stated, "I understand that any text messages coming from the phone number that has been identified as [Wienke] would come in as an admission by party opponents. I'm not going to waste the [c]ourt's time with that." The issue was then set aside to allow the State time to pare down its proposed text message exhibit. The State provided a redacted and pared-down proposed exhibit on the morning of the next day of trial. Detective Pandis testified that he had seized Salminen's cell phone and downloaded its contents and that Wienke was in the contacts list of Salminen's cell phone. Counsel for Wienke objected to this testimony on the grounds of hearsay, but was overruled by the District Court.

---

[1] At trial, Hamm was convicted of, among other charges, two counts of deliberate homicide by accountability under the felony murder rule for the deaths of David and Charla during the robbery of the Taylors' home and sentenced to eighty years in prison. Hamm has appealed and his case is currently pending before this Court in cause no. DA 20-0166.

¶11 Kaleb, who pled guilty to two counts of deliberate homicide for killing his parents and is serving two consecutive life sentences, testified via video from the Montana State Prison. Kaleb testified that he acted alone when he killed his parents, stating Wienke had never touched either the metal rod or the knife, but he did not remember the exact manner in which he killed David and Charla. Kaleb also testified he "slit their throats, like all the way, from ear to ear." The State questioned Kaleb about certain texts he made to his mother's phone and to his aunt after the murders without objection. During cross-examination, the State began to question Kaleb about texts he made to Hamm the day after his theft from the Lincoln Road RV Park. Wienke's counsel objected, noting the issue of the texts had not yet been resolved. The District Court noted the State was not seeking to admit the text message exhibit, and allowed the State to question Kaleb about the texts:

> [Q.] So, Mr. Taylor, the next day -- this would have been March 10th at 11:22 in the morning -- did you send a text to Mr. Hamm indicating, "You're just tripping, bro. You're the one who left." Do you remember sending that text?
>
> [A.] I have no idea, man. That's a two-year-old text. I might text Kyle that on any given day. I have no idea.
>
> [Q.] Okay. Do you recall sending a text at 11:24 -- that would have been a few minutes after that text I just read -- to Mr. Hamm indicating, "I'm heading home soon. You got my back on that or what?"

Wienke's counsel objected on relevance, hearsay, prejudice, and foundation grounds. The District Court overruled the objection, and noted it would put its reasoning on the record later. The State continued questioning Kaleb about texts:

6

[Q.] Mr. Taylor, then, at 11:40, did you send a text message to Mr. Hamm indicating, "Nigga, I need you."

[A.] I have -- dude, I don't know. I don't know about any of these text messages. If I sent it, I sent it. You have the phone records.

[Q.] Do you recall receiving text messages from Mr. Wienke the night that you killed your parents as you were driving around?

[A.] I don't know. Maybe. Again, I have no idea, man. I don't know what text messages I got. You have them in front of you.

[Q.] Would you dispute that the text messages which appear on your phone as "to" or "from" are accurate?

Wienke's counsel again objected on relevance, hearsay, prejudice, and foundation grounds, and was again overruled by the District Court. Later, outside the presence of the jury, the District Court put its reasoning for overruling the objections on the record:

> Kaleb was asked questions about [text messages] that he [sent]. There was an objection to that. And I mistakenly said that this was a statement against interest. You corrected me. It's not a statement against interest, because Kaleb is not [on] trial in this particular case.
>
> What I was going to say, at that point, is that this was communications -- statements -- made during the course of a conspiracy and are therefore admissible. I didn't want to put the word conspiracy in front of this jury, so I did not say anything further at that point.

¶12 Detective Pandis, who had begun his testimony on Monday of the trial, was recalled to continue his direct examination on Thursday. Outside the presence of the jury, the State set forth its plan to question Detective Pandis about texts made by Wienke, rather than admit the exhibit with the text messages. Wienke's counsel reiterated her objections to any text message evidence coming in on the grounds of foundation, hearsay, relevance, and prejudice. The State argued that Rule 1006 allows the admission of a summary of the

7

voluminous data involved, Detective Pandis had already laid sufficient foundation during his testimony on Monday, Wienke's texts were admissible as an admission by a party opponent, the texts were relevant, and their probative value did not outweigh their prejudicial effect. After hearing further argument on the matter, the District Court made its ruling:

> So the objections are overruled. I'll just say, as Mr. Gallagher noted, Rule 1006 does allow a summary. I will say that in -- with 403 -- that their probative value outweighs its prejudicial effect. I'll say that the officer has laid sufficient foundation for each of the phones and their owners.
>
> Particularly, we've identified the phone -- a TracFone -- that belonged to Mr. Wienke. And the number that was associated with that phone we have tied with the phone that Lakota Salminen had in which she identified him as, I believe, Journs -- J-O-U-R-N-S. And Detective Pandis noted that as the phone from which these text messages have been made.
>
> I also find that those statements that are attributed to Hamm and Taylor are transactional. The statements attributed to Mr. Wienke are statements against interest. So I'm finding, for all those reasons, they're admissible. And we won't introduce the document but rather Detective Pandis can read them to the jury.

With the jury back in the courtroom, the State again questioned Detective Pandis regarding his collection of evidence from cell phones involved in the case and the compilation of that data. The State then had Detective Pandis read text messages between Wienke and Hamm from the afternoon of May 18, 2018, prior to the homicides:

> [Q.] And I would ask you -- and we're going to skip the first couple columns with the phone numbers in there -- okay? Could you draw your attention to a text message that is on March 18th, 2018, at 15:32:50? And can you translate that into real time and to/from and what's said?
>
> [A.] So that's 3:32 PM. And that is from the phone number associated with Journey Wienke to the phone number associated with Kyle Hamm.

8

[Q.] And, at that time, on the 18th of March, what does the text say?

[A.] It just says, "What up?"

[Q.] And then is there a response -- and just follow, if you would, as best you can, the next three messages, please.

[A.] Okay. So after the initial text of "What up," Mr. Hamm responds to Mr. Wienke, "Just kicking it, homey. WYD," which I believe is slang for "what you doing?" About a minute later, Mr. Wienke responds to Mr. Hamm, "Just got ready for the day. Lakota's still asleep, so I'm bored AF." And "AF" I believe is slang for "as fuck." And then, about a minute later, Mr. Hamm responds back to Mr. Wienke, "I feel that. I'm just chilling with Kaleb."

.   .   .

[Q.] Could you just take it from there, and go through those three messages, please?

[A.] Okay. So that 16:15 is 4:15 PM. So the first one there is the phone number associated with Mr. Wienke. He sends a message to Mr. Hamm and says, "When you guys are done, I'll be up at the ER. Lakota hurt her eye last night." The next message is Mr. Hamm responding to Mr. Wienke. "Aight, dog. I'll hit you up when we are done." About 30 seconds later, Mr. Wienke responds to Mr. Hamm and says, "Sounds goos." I believe he meant "sounds good."

The State also had Detective Pandis read text messages between Kaleb and Wienke from that same afternoon:

[Q.] Okay. Thanks. Go ahead. Can you start there, please?

[A.] I have the same one, Judge. So I have one at 17:21:45 from Kaleb to Journey that says, "Sup?" I believe that he means that as in "what's up?" At 5:22 PM, Wienke responds to Taylor, "You off yet?" Taylor responds back to Wienke about 30 to 40 seconds later, "Yeah, pretty much. WYD" -- again, what you doing -- Wienke responds [b]ack to Taylor about 35 seconds later, "Sitting at the ER. Lakota just got out." Kaleb responds to Mr. Wienke, "She aight?" And I believe "aight" is just asking if she's all right. Mr.

9

Wienke responds to Mr. Taylor about a minute later, "Yeah. She just scratched her eye." Kaleb responds back to Mr. Wienke, "Damn. How?" And Wienke then responds about 30-40 seconds later. He says, "Dry contact. She couldn't get it out."

[Q.] Okay. Thank you. If I could move you to a text message from Wienke to Taylor at 20:11:20. Do you see that?

[A.] Yes.

[Q.] What time is that?

[A.] 8:11 PM.

[Q.] Okay. What does that text message say?

[A.] From Wienke to Kaleb, "Not sure how much longer."

[Q.] Thank you. Is there a text message -- well, first of all, are there text messages between Mr. Wienke, Mr. Taylor, and Mr. Hamm in the time period between 8:11 PM and 11:04 PM?

[A.] No.

The State finished its text message-related questioning of Detective Pandis by asking him

to read texts sent by Wienke to Kaleb after the homicides:

[Q.] And could you tell us who sent it and who received it, according to the data, and what does it say?

[A.] So according to the data, the phone number associated with Journey Wienke sent a text to Kaleb Taylor at -- it would be 11:13 PM -- "Let's not talk about it in front of Lakota anymore. She's already going to figure it out when the news get out. But I'll erase all messages too."

[Q.] Thank you. Getting to a text message on March 19th, 2018, at 00:47:17 do you find that?

[A.] Yes.

[Q.] Could you tell the jury who sent it, who received it, and what did it say?

10

[A.]  The message was sent from the phone associated with Mr. Wienke to Kaleb Taylor.  It would be 12:45 AM and -- or, excuse me -- 12:47 AM.  And the text says, "Burn it down."

[Q.]  And do you find a text message on March 19th at 05:00:04?

[A.]  Yes.

[Q.]  And could you tell the jury, according to the data, whose phone was used to send and receive, and what did the message say?

[A.]  So this message was sent from the phone associated with Mr. Wienke to Mr. Taylor at 5:00 AM.  And it just says, "Almost here," with a question mark.

On cross-examination, counsel for Wienke had Detective Pandis read two definitions for "burn it down" sourced from the website urbandictionary.com.  One definition referred to blacking out from alcohol, while the other referred to smoking marijuana.  On redirect, the State questioned Detective Pandis regarding his interpretation of the meaning of "burn it down":

[Q.]  Okay.  And so did -- is there anything about these people -- rather than whatever comes off of the Urban Dictionary -- does the term "burn it down" mean anything different to you?

[A.]  I think in the context of everything that we had learned, I believed "burn it down" didn't have anything to do with smoking marijuana.  I believe it was made in an attempt to destroy the scene of the crime.

On re-cross, counsel for Wienke questioned Detective Pandis about his interpretation:

[Q.]  Okay.  And you're taking this "burn it down" to be the worst thing in the world; right?  They're going to burn some house down.  You think that's what that was?

[A.]  I don't think that's the worst part of this entire deal.

11

[Q.] No. But that's the worst interpretation of that phrase; right?

[A.] It could be, yes.

[Q.] And that fits your theory.

[A.] It fits everything surrounding it I would guess.

¶13 Following the conclusion of Detective Pandis's testimony, both the State and Wienke rested their cases. The jury was excused while the parties settled jury instructions. Relevant to the present appeal, Wienke proposed Instruction E, a model instruction on reasonable doubt from the Ninth Circuit, to which the State objected as being cumulative of the reasonable doubt portion of Instruction No. 4, a Montana pattern jury instruction, which the District Court had already read to the jury. Counsel for Wienke stated the court should give proposed Instruction E because, "we think that having an explanation of what reasonable doubt is, consistent with what the Ninth Circuit has instructed, through several years of case law, is a much more accurate and better instruction." The District Court declined to give proposed Instruction E "because it's not in the Montana pattern jury instructions and [Instruction No.] 4 is."

¶14 The jury convicted Wienke of deliberate homicide for causing the deaths of David and Charla Taylor as set forth in Counts II and IV of the Second Amended Information, as well as tampering with or fabricating physical evidence as set forth in Count V. Wienke was sentenced to two concurrent life sentences for the deliberate homicides, and to ten years at the Montana State Prison for tampering with evidence. Wienke appeals. Additional facts will be discussed as necessary below.

12

## STANDARD OF REVIEW

¶15 A district court has "broad discretion to determine the admissibility of evidence in accordance with the Montana Rules of Evidence and related statutory and jurisprudential rules." *State v. McGhee*, 2021 MT 193, ¶ 10, 405 Mont. 121, 492 P.3d 518 (citations omitted). We generally review evidentiary rulings for an abuse of discretion. *McGhee*, ¶ 10. A district court abuses its discretion if it acts arbitrarily, unreasonably, or without employing conscientious judgment, resulting in substantial injustice. *State v. Hart*, 2009 MT 268, ¶ 9, 352 Mont. 92, 214 P.3d 1273.

¶16 "The standard of review of jury instructions in criminal cases is whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case." *State v. Dunfee*, 2005 MT 147, ¶ 20, 327 Mont. 335, 114 P.3d 217 (citing *State v. Courville*, 2002 MT 330, ¶ 15, 313 Mont. 218, 61 P.3d 749). We review a district court's decisions regarding jury instructions for an abuse of discretion. *State v. King*, 2016 MT 323, ¶ 7, 385 Mont. 483, 385 P.3d 561. To constitute reversible error, any mistake in instructing the jury must prejudicially affect the defendant's substantial rights. *Courville*, ¶ 15.

## DISCUSSION

¶17 *1. Did the District Court abuse its discretion by allowing witnesses to testify about certain text messages?*

¶18 Wienke generally asserts the District Court erred in admitting any and all text messages at trial. In his briefing, however, Wienke specifically addresses only four text messages: two were sent by Kaleb to Hamm after his theft of the Lincoln Road RV Park, and two sent by Wienke to Kaleb, one before the homicides and one after. As he did below,

Wienke asserts the texts were inadmissible hearsay, lacked foundation, not relevant, and were unfairly prejudicial. The State asserts the admission of the text messages was allowed under the transaction rule, § 26-1-103, MCA, the texts were neither hearsay pursuant to M. R. Evid. 801(d)(2) nor unfairly prejudicial under M. R. Evid. 403, and any error in admitting the text messages was harmless. We need not reach the State's transaction rule argument, as the remainder of the State's argument is correct.

¶19 We begin with Wienke's hearsay argument. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c). "A statement is not hearsay if . . . [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity, or . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." M. R. Evid. 801(d)(2)(A), (E). As Wienke does in his briefing, we can divide his hearsay argument into those texts sent by Taylor to Hamm on March 10, 2018, and those sent by Wienke on March 18 and 19, 2018.

¶20 Regarding the texts between Taylor and Hamm, the District Court, outside the presence of the jury so as not to put the word "conspiracy" in the jurors' minds, determined the texts were admissible statements made during the course of a conspiracy. Such statements are admissible pursuant to M. R. Evid. 801(d)(2)(E), but, prior to admission, the State is required to "show the existence of the conspiracy by a preponderance of the evidence independent and exclusive of the coconspirator's statement itself." *State v.*

14

*Stever*, 225 Mont. 336, 342, 732 P.2d 853, 857 (1987). Wienke asserts the State did not sufficiently prove a conspiracy in this case, but the entire thrust of the State's case was that Kaleb, Wienke, and Hamm conspired to rob from Kaleb's parents to get money for their drug habits and that conspiracy began before Kaleb stole $400 from the Lincoln Road RV Park on March 10 and continued until after Kaleb and Wienke murdered David and Charla and stole jewelry from the Taylors' home, which was later sold by Wienke and Salminen to purchase drugs. During trial, the State presented sufficient evidence to show a conspiracy involving Kaleb, Wienke, and Hamm to steal from the Taylors, and therefore the three texts read to Kaleb during his testimony were properly admitted under the coconspirator exception to hearsay provided in M. R. Evid. 801(d)(2)(E). The District Court's decision to admit testimony regarding Kaleb's March 10, 2018 text messages was not an abuse of discretion.

¶21 Turning to the texts actually made by Wienke in this case, the District Court, in its oral ruling, determined Wienke's texts would be admissible as "statements against interest." M. R. Evid. 804(3) defines a statement against interest as a "statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not

15

admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

¶22 "We will affirm the district court when it reaches the right result, even if it reaches the right result for the wrong reason." *State v. Ellison*, 2012 MT 50, ¶ 8, 364 Mont. 276, 272 P.3d 646. Here, the District Court's oral ruling that Wienke's texts could be admissible as statements against interest was unnecessary because it is clear, as far as hearsay is concerned, those texts are admissible as Wienke's own statements under M. R. Evid. 801(d)(2)(A), which states a statement is not hearsay if it "is offered against a party and is . . . the party's own statement[.]" Wienke's counsel admitted as much at trial: "I understand that any text messages coming from the phone number that has been identified as [Wienke] would come in as an admission by party opponents. I'm not going to waste the [c]ourt's time with that." While Wienke does spend a portion of his briefing arguing his "burn it down" text would not be admissible under the coconspirator exception of M. R. Evid. 801(d)(2)(E), such is not relevant here because the "burn it down" text came from Wienke, not a coconspirator, and was admissible as a non-hearsay statement pursuant to M. R. Evid. 801(d)(2)(A).

¶23 In addition to hearsay, Wienke asserts his text messages were not admissible because they lacked relevance under M. R. Evid. 402 and because their probative value was outweighed by the danger of unfair prejudice under M. R. Evid. 403. Generally, relevant evidence is admissible. M. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to

the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. In addition, "[r]elevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant." M. R. Evid. 401. "M. R. Evid. 403 provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *State v. Colburn*, 2018 MT 141, ¶ 16, 391 Mont. 449, 419 P.3d 1196 (*Colburn II*) (citing *State v. Ankeny*, 2018 MT 91, ¶ 33, 391 Mont. 176, 417 P.3d 275).

¶24 A district court has broad discretion to determine whether evidence is relevant, and we will only overturn its relevancy determination when there is an abuse of discretion. *State v. Webb*, 252 Mont. 248, 254, 828 P.2d 1351, 1355 (1992) (citations omitted). We find no abuse of discretion in the District Court's determination the text messages were relevant in this case. Kaleb's text messages were relevant to both the State's conspiracy to rob the Taylors theory and to Kaleb's credibility as a witness, while Wienke's text messages—particularly those sent after the homicides—were relevant to both the deliberate homicide and the tampering with evidence charges he faced.

¶25 As far as prejudice, we have previously noted that "[e]vidence the State offers in a criminal case is generally prejudicial to the defendant," *State v. Michelotti*, 2018 MT 158, ¶ 14, 392 Mont. 33, 420 P.3d 1020, but "[e]ven if evidence is potentially unfairly prejudicial, the Rule 403 balancing test favors admission—the risk of unfair prejudice must

substantially outweigh the evidence's probative value." *State v. Madplume*, 2017 MT 40, ¶ 33, 386 Mont. 368, 390 P.3d 142. Here, Wienke focuses primarily on the "burn it down" text as being unfairly prejudicial to him. "Evidence rises to the level of being unfairly prejudicial only 'if it arouses the jury's hostility or sympathy for one side without regard to its probative value, if it confuses or misleads the trier of fact, or if it unduly distracts from the main issues.'" *Madplume*, ¶ 33 (quoting *State v. Hicks*, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149). We find no abuse of discretion in the District Court's determination the probative value of Wienke's text messages outweighed the danger of unfair prejudice. While of course there is prejudice inherent in Wienke's "burn it down" text—sent to Kaleb Taylor after the murder of Taylor's parents and while Wienke and Kaleb were actively tampering with evidence to cover up that crime—the probative value of the text was not outweighed by the danger of unfair prejudice.

¶26 Finally, Wienke also objected to the text messages as lacking foundation. "The determination of whether an adequate foundation exists for the admission of evidence lies within the sound discretion of the district court." *State v. Pol*, 2008 MT 352, ¶ 11, 346 Mont. 322, 195 P.3d 807. Detective Pandis testified earlier in the trial regarding the seizure and extraction of information from the cell phones involved in this case. When ruling on Wienke's objections, the District Court found "[Detective Pandis] laid sufficient foundation" during his testimony. We find no abuse of discretion in the District Court's determination in this regard.

¶27 *2. Did the District Court abuse its discretion by not giving Wienke's proposed instruction regarding reasonable doubt?*

18

¶28 Wienke asserts he is entitled to a new trial because his proposed Instruction E was "a more correct statement of the law of proof beyond a reasonable doubt" than the instruction given by the District Court at trial. Wienke argues the District Court declining to give his "better, fuller instruction" and giving Montana's pattern instruction instead was an abuse of the court's discretion and requires reversal. The State notes Wienke does not appear to argue Instruction No. 4 was itself wrong, but merely that his proposed instruction was better, and contends the District Court's decision to not give Instruction E was not an abuse of its discretion. We agree with the State.

¶29 Regarding reasonable doubt, Instruction No. 4, as read by the District Court stated, in relevant part:

> 3. The State of Montana has the burden of proving the guilt of the Defendant beyond a reasonable doubt. Proof beyond a reasonable doubt is proof of such a convincing character that a reasonable person would rely and act upon it in the most important of his or her own affairs. Beyond a reasonable doubt does not mean beyond any doubt or beyond a shadow of a doubt.
>
> 4. The Defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict. It is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the Defendant is guilty. The Defendant is not required to prove his innocence or present any evidence.

Wienke's proposed Instruction E stated:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced Mr. Wienke is guilty. It is not required that the State prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that Mr. Wienke is guilty, it is your duty to find him not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the Mr. Wienke is guilty, it is your duty to find him guilty.

¶30 Just as he did below, on appeal Wienke continues to contend his proposed Instruction E was "better" than Instruction No. 4. As long as a court instructs the jury that a defendant's guilt must be proven beyond a reasonable doubt, "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243 (1994). Our role, as an appellate court, is not to parse each—correct—proposed instruction, determine which one is "better," and reverse a conviction if the one we determine to be "better" was not given. *See Victor*, 511 U.S. at 27-28, 114 S. Ct. at 1253-54 (Ginsburg, J., concurring in part and concurring in the judgment). We are tasked with determining "whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case." *Dunfee*, ¶ 20. Here, the instructions clearly did so.

¶31 Because Wienke cannot reasonably claim the jury instructions did not fully and fairly instruct the jury in this case, he focuses much of his argument on claiming the District Court did not exercise discretion when it rejected his proposed instruction in favor of the pattern instruction, so its decision was therefore an abuse of discretion. We are not

convinced by this argument. As the District Court more fully explained during the settling of jury instructions:

> You know, my thoughts are -- as you know, I'm pretty reluctant to veer much from the pattern jury instructions. That if the attorneys and the Supreme Court want district court judges to include this in the pattern instructions, they will. But, until then, I'm reluctant to give it. So that will be denied.

The District Court exercised its discretion to not "veer much from the pattern jury instructions." Judges are presumed to know the law and apply it when they make decisions. *See City of Whitefish v. Jentile*, 2012 MT 185, ¶ 34, 366 Mont. 94, 285 P.3d 515. A district court can, of course, "veer" from the pattern instructions in its discretion—but it is not required to when simply presented with an instruction one party argues is "better." While the District Court could have given Wienke's proposed Instruction E in this case, it was not required to, and its decision to not give the instruction was not an abuse of discretion.

¶32 Wienke also implies not giving his proposed Instruction E was error because it invited the jury to speculate on the meaning of reasonable doubt by way of the prosecutor's marriage analogy used during voir dire. He does not address the fact that the jury was instructed to take the law from the District Court's instructions alone and that "American jurisprudence depends on a jury's ability to follow instructions and juries are presumed to follow the law that courts provide." *State v. Sanchez*, 2008 MT 27, ¶ 57, 341 Mont. 240, 177 P.3d 444. Wienke has neither rebutted the presumption that the jury followed the court's instructions nor demonstrated he was prejudiced by the prosecutor's statement. *See State v. Labbe*, 2012 MT 76, ¶¶ 24-29, 364 Mont. 415, 276 P.3d 848 (rejecting a challenge to an identical reasonable doubt jury instruction and a related analogy as to the meaning of

21

"reasonable doubt" made by a prosecutor at trial). Wienke's speculation about the jury's possible speculation is insufficient to warrant reversal in this case.

## CONCLUSION

¶33 The District Court did not abuse its discretion by admitting testimony regarding text messages or by declining to give Wienke's proposed jury instruction regarding reasonable doubt.

¶34 Affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR