**FILED**

April 10 2012

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 11-0050

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 76

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

ROGER LINER LABBE,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 10-79
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Joslyn Hunt, Chief Appellate Defender; Lisa S. Korchinski, Assistant
Appellate Defender; Helena, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General; Micheal S. Wellenstein,
Assistant Attorney General; Helena, Montana

          William E. Fulbright, Ravalli County Attorney; Hamilton, Montana

Submitted on Briefs: February 29, 2012

Decided: April 10, 2012

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Roger Labbe (Roger) appeals from an order of the Twenty-First Judicial District, Ravalli County, denying his motion to suppress statements he made to police officers. He also argues that the District Court erred by overruling his objection to a statement made by the prosecutor during closing argument. We address the following issues:

¶2 *1. Did the District Court err when it denied Roger's motion to suppress statements he made to police outside his house?*

¶3 *2. Did the District Court err by overruling Roger's objection to the prosecutor's statement during closing argument?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4 Roger, age 69, lived with his sister, Shirley Cote (Shirley), age 71. On May 21, 2010, Shirley was talking on the telephone to a computer technician about problems she was having with her computer. The call ended when Shirley hung up on the technician. The technician called back, and Roger answered the phone. Shirley insisted that Roger get off the phone, but Roger refused. Shirley responded by throwing two books at the back of Roger's chair. Roger claimed that Shirley became very angry and started to scratch his face and arms and otherwise became hysterical. Although Roger and Shirley's versions differed, at some point Roger grabbed Shirley and placed her on a bed, restricting her movement. Roger claimed Shirley continued to struggle and that he slapped her to "calm her down." Shirley claimed that Roger choked her until she could not breathe. Both indicated that Roger told Shirley he would kill her if she didn't stop

2

struggling. Roger eventually let Shirley go, and Shirley walked to her daughter's house on an adjoining property.

¶5 Shirley or her daughter then called for an ambulance and police. Two members of the Ravalli County Sheriff's Office arrived on the scene shortly after the ambulance. Deputy Joe Marble was the first officer to arrive and talk to Shirley about her version of events. As Deputy Marble was leaving the house to contact Roger about his version of the events, Sgt. Hudson arrived and accompanied Deputy Marble.

¶6 The officers pulled into Roger's driveway, up to a driveway gate. Upon their arrival, Roger exited the house, walked up to the gate, opened it, and closed it behind him as he approached the officers, talking the entire way. The officers testified that they did not motion for Roger to come to them, did not call him or otherwise indicate that he should talk to them, and that he exited the house on his own. The officers testified Roger appeared to be agitated, seemingly angry, and that he acted "[a]lmost hyper" when telling his side of the story.

¶7 Roger told the officers his sister had thrown two books at him and had scratched his face and arms. He said he slapped her and held her down on the bed because she "went bananas." The officers talked with Roger for a couple minutes and asked several questions, giving him a *Miranda* warning during the conversation, to which Roger replied, "Yes, of course I understand the rights. I'm an ex-con." He further stated he was willing to talk with them. Roger then reiterated that he held his sister down on the bed, slapped her, and threatened to kill her if she didn't knock it off but insisted he did not

3

strangle her as she claimed. Roger was eventually arrested and charged with aggravated assault, a felony, in violation of § 45-5-202, MCA, and partner or family member assault, a misdemeanor, in violation of § 45-5-206(1)(a).

¶8 Roger moved to suppress his statements. He conceded his initial statements were spontaneous but argued that everything he said after the officers asked questions should be suppressed because the *Miranda* warning was ineffective. He asserted the warning was ineffective because he was then in custody, and the officers had employed an impermissible "question first, warn later" interrogation technique. The District Court denied the motion, ruling that Roger was not in custody at the time, and, therefore, a *Miranda* warning was unnecessary.

¶9 Roger proceeded to a jury trial and was acquitted of aggravated assault but convicted of partner or family member assault. During closing argument, the prosecutor likened the burden of proof standard of "beyond a reasonable doubt" to whether jurors would allow Roger to babysit their children. Roger objected on the ground that the statement mischaracterized the burden of proof, and the District Court overruled the objection. Roger appeals from the District Court's denial of his motion to suppress and the denial of his objection to the prosecutor's statement.

**STANDARD OF REVIEW**

¶10 This Court reviews a district court's decision to grant or deny a motion to suppress to determine whether the court's underlying findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those facts. *State v. Main,*

4

2011 MT 123, ¶ 12, 360 Mont. 470, 255 P.3d 1240 (citations and quotations omitted). In determining whether a district court's findings of fact are clearly erroneous, we consider whether the findings are supported by substantial evidence, whether the district court misapprehended the effect of the evidence, or whether this Court's review of the record leaves it with a definite and firm conviction that a mistake has been made. *State v. Lacey*, 2009 MT 62, ¶ 27, 349 Mont. 371, 204 P.3d 1192 (citation omitted).

¶11 "We review allegations of prosecutorial error de novo, 'considering the prosecutor's conduct in the context of the entire proceeding.'" *State v. Roundstone*, 2011 MT 227, ¶ 13, 362 Mont. 74, 261 P.3d 1009 (quoting *State v. Rardon*, 2005 MT 129, ¶ 14, 327 Mont. 228, 115 P.3d 182).

## DISCUSSION

¶12 *1. Did the District Court err when it denied Roger's motion to suppress statements he made to police outside his house?*

¶13 Under the Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution, no person can be compelled to be a witness against himself in a criminal case. *State v. Olson*, 2003 MT 61, ¶ 13, 314 Mont. 402, 66 P.3d 297. The U.S. Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), that a prosecutor may not use statements that stem from the custodial interrogation of a defendant unless the defendant has been warned, prior to questioning, that he has the right to remain silent, to have an attorney present, and that any statements he makes may be used as evidence against him. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. "*Miranda* warnings are not required to be given by law enforcement unless a

person is subject to a custodial interrogation." *State v. Reavley*, 2003 MT 298, ¶ 18, 318 Mont. 150, 79 P.3d 270 (citing *State v. Dawson*, 1999 MT 171, ¶ 30, 295 Mont. 212, 983 P.2d 916). One is "in custody" when his freedom of action has been deprived in any significant way or if his "freedom of action has been curtailed to a degree associated with a formal arrest." *Reavley*, ¶ 18 (citing *Dawson*, ¶ 30).

¶14 Roger concedes that his initial statements, set forth below, were spontaneous and that a *Miranda* warning was not necessary:

.  .  .

| | |
|---|---|
| Roger: | Goin' out of her mind. I slapped her. |
| Dep. Marble: | Do you have any weapons on ya'? |
| Roger: | Oh, no, no, no. |
| Dep. Marble: | Okay. Just turn around and just let me check real quick. |
| Roger: | I was gonna call you guys and my niece says, "Don't call. We'll talk about it." And what does she do? She calls you, that's how much of talking she did. |
| Dep. Marble: | Okay. |
| Roger: | I'm not the troublemaker here . . . my sister is totally gone, totally gone . . . . I've been living with her for five months now and I've been tryin' to deal with it. But . . . today she . . . comes in my room. Sh, two big books of mine, she starts throwin' 'em at me. And I got, she won't deny it, I hope. And then and I'm tryin' to hold her down, she scratches the shit outta me. I slapped her. All because I'm talkin' to a guy that called me about her business line, the, the guy is tryin' to do his job. He's a computer wiz, one of these geeks, you know? |

6

Dep. Marble:    Mm Hmm (indicating "yes").

Roger:    He's tryin' to do his job and because I'm talkin' to the guy, she doesn't want, she, she's gettin' all upset. She's gone nuts. She starts throwin' books at me. And . . . I've got evidence on this because the guy's listening to it the whole thing . . . . The guy is beside himself. I says, "Listen, I'll call you back." . . .

Roger asserts that the officers should have administered a *Miranda* warning right at this point because they started asking questions, and he was then in custody. Because the officers did not administer a warning until later, he argues the warning was untimely and insufficient and that all statements he made after Deputy Marble's first question, including those statements he made after waiving his Miranda rights, should be suppressed pursuant to *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004).

¶15    In *Seibert*, the police purposely employed a "question first, warn later" technique whereby they interrogated the defendant until she confessed, then provided a Miranda warning and re-questioned her, recording both the *Miranda* warning and her post-*Miranda* confession. *Seibert*, 542 U.S. at 604-05, 124 S. Ct. at 2606. The Supreme Court held this practice violated the defendant's right against self-incrimination and affirmed the Missouri Supreme Court's suppression of both the pre- and post-*Miranda* confessions. *Seibert*, 542 U.S. at 606-07, 617, 124 S. Ct. at 2606-607, 2613.

¶16    The State responds that Roger was not in custody, and therefore no *Miranda* warning was required. The State also offers that Roger's post-*Miranda* statements were not the product of an improper "question first, warn later" technique because the officers

were merely attempting to listen to Roger's side of the story to determine what happened, rather than interrogate him to elicit a confession.

¶17    The remaining pre-*Miranda* statements Roger claims should be suppressed were as follows:

Dep. Marble:    Right.  When she threw the books at you, did she hit you with the books or . . . ?

Roger:    No, they glanced, they did went by me.

Dep. Marble:    Okay.  And where did this take place?

Roger:    In my room.  I'm watchin' . . . my computer screen, she's comin' in and the phone rings.  So I'm answerin' it. "Hang that phone up." "Hello? Hello?" I'm talkin' . . . the call is for me.  She, "Hang it up.  I don't want you to talk to him." . . . "Well, I'm gonna talk to him." Well, that did it.

Dep. Marble:    Okay.

Roger:    That did it.  You know, she just went, she went bananas, she, totally out of it.  She was frantic, I mean, she was between scratchin' my face and my arms . . . . She was tryin' to do everything.  I held her down but I mean, she was . . .

Dep. Marble:    What do you mean by you "held her down?"

Roger:    On the bed, . . . I had her on the bed.

Dep. Marble:    And how did she end up getting to the bed?  She threw some books at you, that's all I've heard.

Roger:    Oh, no, no.  I took her and I put her on the bed tryin' to hold her down.  She was goin' crazy.  She was scratchin' me, tryin' to grab me.  She's got nails, I don't know what but, uh, she, uh, so I got her on the

8

|              |                                                                                                                  |
| ------------ | ---------------------------------------------------------------------------------------------------------------- |
|              | bed, holdin' her down. I said, "Hey, that's it, that's it, don't, that's enough," you know?                       |
| Dep. Marble: | Did you make any threats while you were holding her down?                                                         |
| Roger:       | Yes, I did; I fuckin' told her, "You, you knock this shit out or I'll fuckin' kill ya'." . . .                    |
| Dep. Marble: | And how were you holding her down?                                                                                |
| Roger:       | Her arms, arms.                                                                                                   |
| Dep. Marble: | On her upper arms?                                                                                                |
| Roger:       | Yeah.                                                                                                             |
| Dep. Marble: | Okay.                                                                                                             |
| Sgt. Hudson: | Probably a pretty good time to [give a *Miranda* warning] . . . . (at which time a warning was given)             |

The first step in the analysis is to determine whether Roger was in custody. This question is considered "on a case-by-case basis and focuses on whether a 'reasonable person' would feel free to leave," examining six factors. *Reavley*, ¶ 19 (citing *Dawson*, ¶ 33). The factors are: (1) place of the interrogation; (2) time of the interrogation; (3) persons present during the interrogation; (4) whether *Miranda* warnings were gratuitously given;[1] (5) the length and mood of the interrogation; and (6) whether or not the suspect was arrested following the interrogation. *Lacey*, ¶ 59 (citing *Reavley*, ¶ 19).

---

[1] We clarified in *State v. Munson*, 2007 MT 222, 339 Mont. 68, 169 P.3d 364 n. 1, that "the fact that the officer gave *Miranda* warnings during the course of the encounter may be considered in determining whether the individual was in custody; however, if all other considerations dictate that the individual was not in custody, the fact that *Miranda* warnings were given will not by itself convert the otherwise noncustodial situation into a custodial one."

¶18    Applying these factors, the contact between Roger and the officers occurred in the driveway of Roger's home, which is located in a rural part of Ravalli County. The officers pulled up to a gate at the foot of the driveway. A fence surrounded the house. Roger voluntarily exited the house and walked through the gate to meet the officers. The time was 2:20 on a Friday afternoon. The persons present were Roger, Deputy Marble, and Sgt. Hudson. After Roger made several inculpatory statements, Deputy Marble administered a *Miranda* warning to Roger. Roger acknowledged that he understood his rights and said "I don't have a problem talking to you." Roger then reiterated that he had threatened and slapped his sister. The length of the conversation was approximately 15 minutes long, and the record reflects that both officers spoke calmly and respectfully. While Roger was also cooperative and respectful, his comments reflected his agitation. Finally, Roger was arrested at the end of the interview.

¶19    The District Court held that all of the factors, except for factor six, Roger's arrest at the end of the interview, favored a determination that Roger was not in custody during the interview, and therefore, a *Miranda* warning was not necessary. The District Court noted that Roger made the first contact by voluntarily exiting the house, going through the gate, and meeting the officers in the driveway. It reasoned that "[a]s to the six questions [Roger] was asked prior to being Mirandized, all but one were asked to clarify [Roger]'s previous statements" and that the officers did not badger, intimidate, or threaten Roger. The District Court concluded that the facts were distinguishable from

those in *Seibert*, where the defendant was clearly in custody, having been arrested and transported to the police station prior to being questioned.

¶20 Roger argues that he did not pick the time or the place of the interview and that the officers were armed and in uniform, which would make a reasonable person feel intimidated. However, as the District Court noted, Roger chose to engage the officers before they had a chance to say anything to him, and they acted respectfully, without any threatening language. In fact, Roger said, "[t]hat's a nice looking gun . . . I love guns but I can't have 'em"—hardly an indication he was intimidated by the officers' weapons.

¶21 The circumstances surrounding Roger's statement were clearly dissimilar to those in *Seibert*. We agree with the District Court that all of the factors except for Roger's arrest weigh in favor of a determination that Roger was not in custody at the time he talked with the officers and that a *Miranda* warning was not necessary at any earlier point. *See Reavley*, ¶ 18. The District Court correctly denied Roger's motion to suppress the statements he made to the officers.

¶22 *2. Did the District Court err by overruling Roger's objection to the prosecutor's statement during closing argument?*

¶23 "[A]lthough counsel may comment on the burden of proof as it relates to facts presented in trial, it may not go outside the record or misrepresent the law as instructed by the judge." *State v. Stewart*, 2000 MT 379, ¶ 40, 303 Mont. 507, 16 P.3d 391 (citation omitted). In determining whether a prosecutor's statement requires reversal, we first examine whether the comments were improper. *State v. Kolb*, 2009 MT 9, ¶ 10, 349 Mont. 10, 200 P.3d 504; *State v. Sanchez*, 2008 MT 27, ¶ 51, 341 Mont. 240, 177 P.3d

11

444. If so, we then determine whether the comments prejudiced the defendant's right to a fair and impartial trial. *Kolb*, ¶ 10 (citing *Sanchez*, ¶ 51). Statements made during arguments are considered in the context of the entire argument. *State v. Roubideaux*, 2005 MT 324, ¶ 15, 329 Mont. 521, 125 P.3d 1114 (citing *State v. Miller*, 1998 MT 177, ¶ 37, 290 Mont. 97, 966 P.2d 721, *State v. Hart*, 191 Mont. 375, 384, 625 P.2d 21, 26 (1981)).

¶24 Roger argues the following statement by the prosecutor during rebuttal closing argument was prejudicial and violated his right to a fair and impartial trial:

> [Prosecutor]: The standard of beyond a reasonable doubt is in your Jury Instruction No. 3, "of such convincing character that a reasonable person would rely and act upon it in the most important of his or her own affairs," the third numbered paragraph. "The most important of his or her own affairs." Let me suggest another that I believe is one of our most important affairs, and that's caring for our children. With what you know, would you hire him as a baby[sitter]? That's another way to look at it.
>
> [Defense Counsel]: Objection, Your Honor, that's not an accurate statement of the burden of proof. It relies on fears about somebody, not ration.
>
> The Court: Well, it's final argument.
>
> [Prosecutor]: Thank you. Given that, what I'm asking you to do is to tell this defendant that what he did was unacceptable. And the way we say that, the only way a jury can say it, is by saying the word guilty to the aggravated assault and guilty to the family member assault, the lesser crime of family member assault . . . .

Roger argues that by tying the concept of reasonable doubt to whether jurors would hire Roger as a babysitter, the prosecutor violated Roger's right to a fair and impartial trial by making reasonable doubt something akin to any doubt or the slightest doubt. He argues

12

that "[p]arents do not reject or fire a babysitter if beyond a reasonable doubt that person is bad. Parents terminate or refuse to employ a babysitter if the *slightest* possibility exists that the person is bad. A slight doubt about a person is all that's needed for a parent to keep them away from their child(ren). The prosecutor turned reasonable doubt on its head . . . ."

¶25 The State argues that the prosecutor's statement was not improper but, even if it was, the jury instructions made clear that the jury was to take the law only from the court, and not counsel. The State reasons that if the jury had misunderstood the concept of reasonable doubt and thought it was something less than what was instructed, then the jury surely would have convicted Roger of aggravated assault instead of acquitting him of that charge.

¶26 The District Court instructed the jury that "[p]roof beyond a reasonable doubt is proof of such a convincing character that a reasonable person would rely and act upon it in the most important of his or her own affairs. Beyond a reasonable doubt does not mean beyond any doubt or beyond a shadow of a doubt."

¶27 It is improper for a prosecutor to misstate the law. *Sanchez*, ¶¶ 52-54; *Stewart*, ¶ 40. The prosecutor argued that the jurors deciding whether to leave their children in the defendant's care was an example of one of "the most important of his or her own affairs" referenced in Jury Instruction 3, the reasonable doubt instruction. To the extent that this statement would be considered improper, we would then determine whether the statement was prejudicial to Roger's right to a fair and impartial trial. *Sanchez*, ¶ 51.

13

¶28 The jury was also instructed that "[y]ou should take the law in this case from my instructions alone. You should not accept anyone else's version as to what the law is in this case . . . Counsel, however, may comment and argue to the jury upon the law as given in these instructions . . . ." The jury members were able to take a copy of the judge's jury instructions to the deliberation room with them. "American jurisprudence depends on a jury's ability to follow instructions." *Sanchez*, ¶ 57. "It is a well recognized principle of law that juries are presumed to follow the law as given them." *State v. Turner*, 262 Mont. 39, 55, 864 P.2d 235, 245 (1993) (citations omitted).

¶29 We conclude that Roger has not rebutted the presumption that the jury followed the court's instructions nor demonstrated that he was prejudiced by the prosecutor's statement. *See Sanchez*, ¶ 58. The comment was brief, and the prosecutor did not return to this theme following the objection. The statement was made in argument, and the jury received and took with them the instruction requiring that they take the law from the court only.

¶30 Affirmed.

/S/ JIM RICE

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT

14