FILED

03/05/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0030

DA 22-0030

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 42

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CHRISTOPHER MICHAEL WELCH,

      Defendant and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Twenty-Second Judicial District, In and For the County of Carbon, Cause No. DC-20-14 Honorable Matthew J. Wald, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

          James M. Siegman, Attorney at Law, Jackson, Mississippi

      For Appellee:

          Austin Knudsen, Montana Attorney General, Christine Hutchison, Assistant Attorney General, Helena, Montana

          Alex Nixon, Carbon County Attorney, Red Lodge, Montana

                    Submitted on Briefs:  October 18, 2023

                              Decided:  March 5, 2024

Filed:

                        _____
                                  Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Christopher Michael Welch (Welch) appeals his conviction for attempted incest, incest, sexual abuse of children, and unlawful restraint, entered in the Twenty-Second Judicial District Court, Carbon County. We affirm.

¶2 We restate the issues on appeal as follows:

1. *Do Welch's unpreserved claims of prosecutorial misconduct warrant plain error review?*

2. *Did the District Court abuse its discretion when it imposed conditions of supervised release prohibiting Welch from using alcohol, frequenting bars and casinos, and gambling?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 Welch began dating J.P.'s Mother (Mother) in 2018 after they met on social media. At the time, Mother had three daughters, including J.P. Welch and Mother had a tumultuous relationship and in January of 2019 Mother learned that Welch was dating someone else and they broke up. However, one week later they resumed their relationship and Welch informed Mother that to stay together, he wanted to have a child with Mother. Mother agreed and in February of 2019 she became pregnant with Welch's child. Mother and her three daughters moved in with Welch in his Billings home. However, Mother was unhappy in Billings and after only two months she, Welch, and the children all moved back to her home in Joliet. The couple married in the spring of 2019.

¶4 At this time, J.P. was fourteen years old and had what Mother described as a good relationship with Welch in which J.P. enjoyed his company and looked up to him as a father figure. Mother stated that Welch and J.P. often spent time alone together while Mother

was working. She also testified that Welch showed particular interest in J.P. and did not make the same effort to establish a relationship with her two younger daughters. J.P. testified that although she was initially distant with Welch, after they moved in together in Billings their relationship got better, and she began to spend more time alone with him. Their relationship eventually developed into what she described as a father-daughter relationship. However, after the family moved back to Joliet, Welch's behavior towards J.P. began to change and make J.P. uncomfortable.

¶5     J.P. recounted that one time while she and Welch were babysitting her two sisters, they were in her room alone when Welch asked if she was a virgin. She responded that she was and then Welch asked if she wanted to know what it felt like. J.P. thought Welch was asking to have sexual intercourse and responded that she did not want to know what if felt like with him. After J.P. told Welch this, Welch crawled up to her as she was laying on her bed and reached his hand under the blanket towards her vagina. J.P. pushed his hand away and tucked the blanket under her leg. Mother returned home shortly and J.P. testified that Welch held a finger up to his lips and mouthed, "[d]on't say anything."

¶6     J.P. also testified about another incident with Welch roughly one week after the encounter in her bedroom. During this incident she was standing in the kitchen when Welch said, "I need to talk to you" and motioned for her to come to his bedroom. J.P. testified that she told Welch he could speak to her in the kitchen. Welch then said that it would just take a second and began making gestures. J.P. reenacted these gestures for the jury which were described as her "holding a loose fist with her left hand and pointing with

3

her index finger, inserting into the fist" suggesting sexual intercourse. J.P. stated that she eventually walked up to Welch's room but remained in the doorway and saw that he was sitting on his bed. Welch told J.P. to come closer and once she did, J.P. stated that he told her "he wanted to go down on [her] and finger [her] and have sex with [her]." Welch also told J.P. that he wanted her to touch him, grabbed her hand, and pulled it towards his penis. J.P. said at this point she pulled her hand away from him.

¶7 At trial, J.P. told the jury how she turned and tried to leave Welch's room but he grabbed her arm and pushed her up against the wall. She testified he held her face and put his leg on the side of her so she could not get out of the door. At this point, Welch began kissing J.P.'s neck as she was fighting to get away. J.P. managed to break free of Welch's grip but as she turned to leave, he reached and grabbed in between her legs to restrain her. J.P. testified that Welch began rubbing his hands over her vagina as she yelled for him to stop. She managed to get out of the room and testified that afterwards they "sat down on the couch in silence, like that never happened." However, their relationship "was very different" from that moment on.

¶8 In the summer of 2019, Mother noticed a change in J.P.'s behavior and demeanor. Mother testified that J.P. no longer wanted to spend time with Welch and began isolating herself in her room. Around the same time, Mother and Welch's relationship began to deteriorate. Welch stopped being intimate with Mother and started sleeping on the couch. Eventually Welch moved out in August of 2019.

4

¶9 Mother testified that shortly after Welch moved out, she and J.P. were driving alone when J.P. asked Mother if she intended to get back together with Welch. Mother responded that she was unsure because she loved Welch. However, Mother stated that she felt J.P. had something bad to tell her which led to a conversation during which J.P. disclosed Welch's abuse. Mother located a police officer and reported what J.P. had told her. The officer then took both to the courthouse to make a statement.

¶10 The State filed an Amended Information on May 25, 2021, charging Welch with attempted incest, incest, sexual abuse of children, and unlawful restraint. A jury trial was held from July 12-13, 2021. During voir dire, the State asked potential jurors numerous questions related to their familiarity with sexual abuse, the ways in which it can occur, and the believability of witnesses. The State asked prospective jurors to raise their hands if they or someone they knew had been a victim of sexual abuse. The State also asked potential jurors if they would "agree that a lot of this stuff, there is no -- it all happens in secret -- not all, but for the most part, it is a secretive thing; right?"

¶11 Apart from direct questions which the State posed during voir dire, some of the questions were asked as a result of specific responses the State received from potential jurors. For example, when one potential juror remarked that someone he knew had confided in him that she had been abused and he believed her because of her demeanor, the State followed up by asking, "[d]oes anyone have a problem with that, believing somebody based on their demeanor, not necessarily detail?" In another instance, after a prospective juror indicated that lack of eye contact does not necessarily mean an individual

5

is lying and could instead just be nervousness, the State responded, "[t]hat makes sense. Does anybody agree with [this prospective juror]? Could everybody agree it's kind of a whole package deal, it's not just how they look, it's not just what they're saying, it's kind of the whole perception of the story; would everybody agree with that?" Finally, the State announced to the prospective jurors that this case would strictly revolve around testimony and would not include any forensic evidence or DNA.

¶12 During closing statements, the State again emphasized the case revolves around testimony rather than physical evidence. In particular, the State focused on the importance of J.P.'s testimony, stating, "[s]he's the only one that was there with him -- mom wasn't there, she was at work -- she was the only one, and she sat there and told you what happened. It wasn't easy for her, I'm sure, but she did it." During Welch's closing, he indicated that J.P. lied during her testimony and suggested that her motive was to prevent Welch from getting back together with her mother. Welch provided several possible reasons for this, including that J.P. was angry at Welch for cheating on her mother, a traumatic past with prior men in her Mother's life, and being angry about relocating twice in a month due to Welch and her Mother's relationship.

¶13 The State responded that although Welch had repeatedly pushed J.P. in her testimony, her story remained the same and did not waver. In its final statements, the State closed by saying:

> Ladies and gentlemen, the State -- better yet, [J.P.] proved this case to you beyond a reasonable doubt. If you believe that he tried to touch her vagina in the bed that night; guilty. If you believe that he touched her vagina that other night in the bedroom when she's struggling, trying to get away from

6

him; guilty. If you believe that he encouraged her to touch and masturbate his penis; guilty. If you believe that he restrained her and interfered with her liberty substantially; guilty. Thank you.

Welch never objected during any of the State's closing arguments.

¶14 The jury returned a verdict of guilty on all four counts. Welch was sentenced to 50 years in the Montana State Prison with 25 years suspended, all sentences to run concurrently. He was ordered to complete Phases I & II of the Sexual Offender Program before being eligible for parole. Following recommendations in the Presentence Investigation Report (PSI), the District Court imposed several restrictions on Welch, including that he not gamble, enter bars or casinos, or possess alcohol or drugs. Welch objected to several of these conditions during sentencing.

¶15 Welch appeals.

## STANDARD OF REVIEW

¶16 This Court "generally do[es] not address 'prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial.'" *State v. Mercier*, 2021 MT 12, ¶ 13, 403 Mont. 34, 479 P.3d 967. "However, we may choose to exercise discretionary plain error review where the alleged error may result in a manifest miscarriage of justice, leaves unsettled questions of fundamental fairness, or compromises the integrity of the judicial process." *State v. Wells*, 2021 MT 103, ¶ 13, 404 Mont. 105, 485 P.3d 1220. "Plain error review is reserved for exceptional cases and will be used sparingly." *State v. Robertson*, 2015 MT 266, ¶ 13, 381 Mont. 75, 364 P.3d 580. "When the argument is made for the first time on appeal, 'we first determine whether the defendant's fundamental constitutional

rights have been implicated.'" *State v. Ritesman*, 2018 MT 55, ¶ 21, 390 Mont. 399, 414 P.3d 261.

¶17 This Court "review[s] the reasonableness of conditions or restrictions imposed in a sentence for abuse of discretion, if the conditions are objected to at sentencing." *State v. Leyva*, 2012 MT 124, ¶ 15, 365 Mont. 204, 280 P.3d 252. "A district court abuses its discretion when it 'acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice.'" *In re R.M.T.*, 2011 MT 164, ¶ 26, 361 Mont. 159, 256 P.3d 935.

## DISCUSSION

¶18 *1. Do Welch's unpreserved claims of prosecutorial misconduct warrant plain error review?*

¶19 At the outset we note that because Welch did not object to any of the challenged statements made by the State at trial, he can only obtain review if he demonstrates that he is entitled to plain error review. First, Welch argues that the prosecutor repeatedly vouched for the credibility of J.P. He contends the State knew the jury would be making its decision based on the credibility of the witnesses' testimony and began establishing early on during voir dire that J.P.'s credibility would be essential to the verdict. Welch argues that the State began laying the foundation for improper vouching when it asked: "[s]o me telling you that there's not going to be a shred of scientific evidence in this case, there will be no doctor, no scientist, no semen, no blood swabs, no spit, nothing, it's going to be strictly testimony, does that cause a problem for you?" Welch also emphasizes that the State later asked, "[c]ould everybody agree it's kind of a whole package deal, it's not just how they

8

look, it's not just what they're saying, it's kind of the whole perception of the story; would everybody agree with that?"

¶20 We observe that the State's comments served to inform prospective jurors that not all sexual offenses involve DNA, have forensic evidence, or require sexual intercourse. Moreover, statements from the State concerning witness credibility, their demeanor, and their appearance were consistent with the jury instruction provided by the District Court concerning factors a juror is to consider when evaluating the weight that jurors should give witness testimony. The instruction makes clear that when evaluating a witnesses' testimony, jurors can consider the witness's appearance, manner, candor, bias, and other factors when reaching a decision. We decline to exercise plain error review over this alleged error of prosecutorial misconduct. The statements do not result in a manifest miscarriage of justice, affect the fundamental fairness of the trial, or compromise the integrity of the judicial process.

¶21 Welch also argues that the State engaged in witness vouching during closing arguments. For example, Welch argues the State improperly vouched for J.P.'s testimony when it said:

> [a]t the start of this, there was no secret that this was going to be just about testimony, it was no secret that there was no DNA evidence, anything like that. You guys knew that going in, and everybody agreed that would be sufficient, that you would believe the person that was talking.

¶22 This Court has previously held that a prosecutor during closing argument "may comment on 'the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles

9

involved, to be presented in instructions to the jury. . . .'" *State v. McDonald*, 2013 MT 97, ¶ 14, 369 Mont. 483, 299 P.3d 799. Here, the State's closing argument reiterated what its voir dire emphasized regarding the lack of forensic evidence, which we have determined does not warrant plain error review. We similarly conclude that these statements do not warrant plain error review and have not resulted in a manifest miscarriage of justice, affected the fundamental fairness of the trial, or compromised the integrity of the judicial process.

¶23 Second, Welch claims that the State's comments during closing argument that J.P. "never wavered" and that "she corrected Defense counsel over and over again" also were improper and asks that we exercise plain error review. We have held that:

> [w]hile it is generally improper for the prosecution to offer *personal opinions* as to the credibility of the accused or the witnesses . . . "it is proper for a prosecutor to comment on conflicts and contradictions in testimony, as well as to comment on the evidence presented and suggest to the jury inferences which may be drawn therefrom."

*McDonald*, ¶ 14 (emphasis in original). This Court "consider[s] alleged improper statements during closing argument in the context of the entire argument." *State v. Aker*, 2013 MT 253, ¶ 24, 371 Mont. 491, 310 P.3d 506. Here, when considering the State's closing in the context of the entire argument, the State was responding to Welch's closing during which he emphasized that J.P. may have fabricated her claims in an attempt to get back at Welch for cheating on her Mother or to prevent him from getting back together with her. Additionally, during opening statements, Welch stated "[y]ou are going to get a lot of information during this trial. There are going to be many stories told, sometimes

10

more than one story told by the same person . . . .'" The State's argument rebutted Welch's claim that more than one story was told by the same person by observing that J.P. did not waver during her testimony and, in fact, repeatedly corrected counsel during cross-examination. On this record, we cannot conclude that the alleged error created a manifest miscarriage of justice, left unsettled questions of the trial's fundamental fairness, or that the judicial process was compromised. Accordingly, we decline to exercise plain error review.

¶24 Finally, Welch argues that the State made inappropriate emotional appeals to the jury. Welch maintains the State's following arguments were improper:

> [i]magine being a 14-year-old girl and that's the message you are getting from your stepdad. He asks you about sex, and the tone and tenor of that conversation is so obvious, a 14-year-old says, "I don't want to know what it's what it's [sic] like from you" This wasn't a mistake, it wasn't an accident that he reached out and touched her.

Welch argues that the State asking the jury to "imagine," in this statement, and on two other occasions, was an improper "Golden Rule" argument which permitted the jury to ignore the instructions given them by the District Court. A golden rule argument asks the jurors to imagine themselves or someone they care about in the place of the victim. Golden rule arguments are prohibited because they permit the jury to unduly sympathize with the victim and not exercise sound and reasonable judgment. Here, the State asked the jury to evaluate the tone and tenor of J.P.'s conversation with Welch from the perspective of a 14-year-old girl and within the context of Welch's explanation that he was just having a normal conversation about sexual education with his stepdaughter. On another occasion,

11

the State argued that Welch "reache[d] around and put[] both of his hands between her legs for five or ten seconds, imagine that, think how long five or ten seconds is to have your stepdad's hands on your vagina. That wasn't an accident . . . ." The State was asking the jury to consider the length of time over which the assault occurred in order to demonstrate five to ten seconds was not a short amount of time for the assault described by J.P. Lastly, the State again reminded the jurors in rebuttal that Welch had asked J.P. if she wanted to know what sex feels like and that J.P. told him she did not want to know what sex felt like from him.

¶25 Here, the court instructed the jury that "[t]he law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." The court also instructed the jury that they "may infer mental state from what the Defendant does and says and from all the facts and circumstances involved." Juries are presumed to follow the instructions and law given to them by the court. *State v. Labbe*, 2012 MT 76, ¶ 28, 364 Mont. 415, 276 P.3d 848. And, this Court "do[es] not presume prejudice from the alleged prosecutorial misconduct; rather, the 'defendant must show that the argument violated his substantial rights.'" *Aker*, ¶ 24. Even when substantial rights are implicated, "we will not invoke the plain error doctrine to reverse a conviction when 'the alleged error did not result in a miscarriage of justice, raise a question as to the fundamental fairness of the proceedings, or compromise the integrity of the judicial process.'" *Ritesman*, ¶ 21.

¶26 Welch has failed to meet the standard for this Court to exercise plain error review. He has failed to demonstrate that, even assuming his fundamental and substantial right to a fair trial may have been implicated, our failure to exercise plain error review would result in a manifest miscarriage of justice, leaves unsettled questions of fundamental fairness, or compromises the integrity of the judicial process. Accordingly, on this record, we decline to exercise plain error review.

¶27 Welch also argues that under the cumulative error doctrine, all the statements made by the State during voir dire and closing, when taken together, prejudiced his right to a fair trial. The cumulative error doctrine requires "reversal of a conviction where numerous errors, when taken together, have prejudiced the defendant's right to a fair trial." *State v. Smith*, 2020 MT 304, ¶ 16, 402 Mont. 206, 476 P.3d 1178. However, "[t]he defendant must establish prejudice; a mere allegation of error without proof of prejudice is inadequate to satisfy the doctrine." *Smith*, ¶ 16. Here, Welch has failed to demonstrate plain error review is warranted and therefore has failed to establish any error. We conclude review under the cumulative error doctrine is not appropriate.

¶28 *2. Did the District Court abuse its discretion when it imposed conditions of supervised release prohibiting Welch from using alcohol, frequenting bars and casinos, and gambling?*

¶29 Welch argues on appeal that certain probation restrictions imposed by the District Court were improper as they do not have a reasonable nexus to the offense charged. Specifically, Welch argues that the restrictions prohibiting him from using or possessing alcohol and illegal drugs, requiring that he submit to testing for alcohol and drugs,

13

prohibiting him from gambling and entering casinos, and prohibiting him from entering bars were an abuse of discretion by the District Court and should be reversed. In support of this argument Welch cites *State v. Ashby* in which this Court held, "[when] imposing conditions of sentence, a sentencing judge may impose a particular condition of probation so long as the condition has a nexus to either the offense for which the offender is being sentenced, or to the offender himself or herself." 2008 MT 83, ¶ 15, 342 Mont. 187, 179 P.3d 1164.

¶30    Conversely, the State argues that the conditions imposed were standard conditions of probation authorized by statute and therefore the nexus to the offender analysis does not apply. Rather, the State argues that standard conditions of probation are included as part of a probationary sentence unless the sentencing court finds "in the exercise of its discretion, that a standard condition is inappropriate under the sentence it is imposing." *State v. Hernandez*, 2009 MT 341, ¶ 7, 353 Mont. 111, 220 P.3d 25.

¶31    Sentencing judges have "sweeping authority to impose any 'reasonable restrictions or conditions considered necessary for rehabilitation or for the protection of the victim or society.'" *State v. Green*, 2012 MT 87, ¶ 10, 364 Mont. 515, 276 P.3d 929 (quoting § 46-18-201(4)(p), MCA). "On appeal, the Appellant has the burden to present legal authority that establishes error on the part of the district court." *Hartsoe v. Christopher*, 2013 MT 57, ¶ 16, 369 Mont. 223, 296 P.3d 1186.

¶32 During sentencing, the District Court listed 49 "terms and conditions" that Welch would be required to comply with during the suspended portion of his sentence. Welch objected to four of them:

> 10. The Defendant is prohibited from using or possessing alcoholic beverages and illegal drugs. The Defendant is required to submit to bodily fluid testing for drugs or alcohol on a random or routine basis and without reasonable suspicion.

> 11. The Defendant is prohibited from gambling.

> 21. The Defendant shall not enter any bars.

> 22. The Defendant shall not enter any casinos.

The Department of Corrections lists 12 conditions which are considered standard. Numbers 9 and 10 read as follows:

> (9) The offender is prohibited from using or possessing alcoholic beverages and illegal drugs. The offender is required to submit to bodily fluid testing for drugs or alcohol on a random or routine basis and without reasonable suspicion.

> (10) The offender is prohibited from gambling.

Admin. R. M. 20.7.1101(9)-(10) (2008).

¶33 In *Hernandez*, for a conviction of sexual assault on a child, the court imposed the following condition as part of the suspended portion of Hernandez's sentence:

> The Defendant will obtain permission from his Probation & Parole Officer before financing or purchasing a vehicle, property, or engaging in business. The Defendant will not go into debt without his Probation & Parole Officer's permission. Restitution, child support, fines, and fees will be the Defendant's priority financial obligations.

15

*Hernandez*, ¶¶ 1-2.  Hernandez objected to this condition during sentencing and appealed. On appeal, like Welch, he cited *Ashby* and argued that because the condition concerned financial transaction restrictions, it had no nexus to himself or the offense.  *Hernandez*, ¶ 3. This Court rejected his argument reasoning that Admin. R. M. 20.7.1101(6) provided "[t]he offender must obtain permission from his/her supervising officer before engaging in business, purchasing real property, purchasing an automobile, or incurring a debt." *Hernandez*, ¶ 5.  We concluded the condition was authorized by statute and rule and the *Ashby* requirement of a nexus to the offender or to the offense did not apply.  *Hernandez*, ¶ 6.

¶34     Like *Hernandez*, two of the conditions which Welch objected to during sentencing—the prohibition on possessing and using alcohol and the prohibition on gambling—are standard conditions under Admin. R. M. 20.7.1101(9)-(10) and are authorized by statute and rule.  Therefore, they are not subject to the nexus requirement set forth in *Ashby*.[1]  The District Court had the discretion not to impose a standard condition of probation.  *Hernandez*, ¶ 7.  Welch has failed to demonstrate that the court abused its discretion when it imposed the disputed standard conditions of probation.

---

[1] The other two conditions—prohibiting Welch from entering bars and casinos—are not standard conditions under Admin. R. M. 20.7.1101.  However, as this Court previously held in *State v. Winkel*, the "condition prohibiting [the defendant] from entering casinos, where alcohol is universally and conspicuously available, is consistent with the condition prohibiting him from possessing or consuming intoxicants."  2008 MT 89, ¶ 19, 342 Mont. 267, 182 P.3d 54. Furthermore, "[s]ince alcohol is inseparable from gambling in Montana casinos, this condition achieves the same objectives of rehabilitation and protection."  *Winkel*, ¶ 20.  We also note that Welch's PSI identifies a significant history of drug use and a prior DUI.  Hence, the Ashby nexus requirement to the offender is satisfied.  *Ashby*, ¶ 15.

16

**CONCLUSION**

¶35 We conclude that Welch's claim of prosecutorial misconduct should not be reviewed under the plain error. The probationary conditions imposed by the District Court were standard probationary conditions authorized by statute and rule. Welch has failed to demonstrate that the District Court abused its discretion when it imposed these standard conditions.

¶36 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE